UNITED STATES, Appellee,

v.

Michael J. BURNS, Senior Airman, U.S. Air Force, Appellant.

No. 64,916.
ACM 28195.

U.S. Court of Military Appeals.

Argued Feb. 12, 1991.

Decided Sept. 30, 1991.

For Appellant: *Captain Ronald A. Gregory* (argued); *Major Ronald G. Mor-*

*gan* (on brief); *Colonel Richard F. O'Hair* and *Lieutenant Colonel Jeffrey R. Owens.*

For Appellee: *Captain Morris D. Davis* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Major Paul H. Blackwell, Jr.* (on brief); *Colonel William R. Dugan, Jr.*

### Opinion of the Court

EVERETT, Senior Judge:

On August 22 and 23, 1989, Senior Airman Michael J. Burns was tried at Laughlin Air Force Base, Texas, by a general court-martial composed of a military judge alone. Contrary to his pleas, he was found guilty of wrongful use of marijuana, conspiracy to distribute it, and two offenses of wrongful distribution of marijuana, in violation of Articles 81 and 112a, Uniform Code of Military Justice, 10 USC §§ 881 and 912a, respectively. Burns was sentenced to a bad-conduct discharge, confinement and forfeiture of $466 pay per month for 10 months, and reduction to Airman Basic.

After his conviction had been upheld by all intermediate reviewing authorities, we granted this issue for review:

WHETHER APPELLANT'S REQUEST FOR COUNSEL RENDERS INVOLUNTARY A CONSENT TO SEARCH PRIOR TO APPELLANT BEING GIVEN THE OPPORTUNITY TO CONSULT COUNSEL.

Having found no reversible error, we now affirm the conviction.

### I

Before trial began, appellant's defense counsel moved to suppress items containing marijuana residue that had been seized from Burns' residence during a search conducted by military investigators. The defense contended that the evidence was inadmissible because Burns' unanswered request for a lawyer rendered involuntary his subsequent consent to a search of his residence. Furthermore, the defense claimed that the evidence had been obtained in violation of Burns' Sixth Amendment right to counsel.

Trial counsel then attempted to establish that the marijuana residue had been seized properly. In response to the motion to suppress, trial counsel first called Staff Sergeant Dewey, a security police investigator assigned to the Air Force Office of Special Investigations (OSI) Joint Drug Enforcement Team. On Sunday, April 30, 1989, at about 9:00 p.m., Dewey and U.S. Border Patrol Agent Tom Defee were following appellant's automobile on Highway 90. Airman Ewbanks, their undercover "source" and informant, was riding with Burns; and when he gave a prearranged signal indicating that Burns had sold him marijuana, the agents pulled over Burns' vehicle. Almost immediately, other law-enforcement agents converged at the scene. Dewey retrieved from Ewbanks "a small bag of marijuana and a pack of rolling papers"; and Burns and Ewbanks were placed under arrest for drug offenses.[1]

After Burns was handcuffed and read his Article 31, UCMJ, 10 USC § 831, rights by OSI Agent Grunow, who had participated in the arrest, he stated that he wanted a lawyer, and all interrogation ceased. He then was taken to the OSI office at Laughlin Air Force Base and placed in a room used by the OSI "for normal day-to-day work." Burns was left there while OSI agents processed the seized evidence and talked to other investigators from the task force. Occasionally, agents came in and out of the room where Burns had been left; but because of his earlier request for counsel, none of them tried to interrogate him.

According to two OSI agents who testified at trial, they never denied a suspect access to counsel if one was demanded. Normally, they would dial the attorney's number and hand the telephone to a suspect who asked for an attorney. However, this was not done for Burns, because he did not specifically ask the agents to contact a lawyer at that time. However, he was given the telephone number of the area defense counsel on the installation.

---

1. Ewbanks was placed under arrest to maintain his "cover."

After Burns had been kept in the room some 42 minutes, SSgt Dewey entered and asked him if he would allow the OSI to search his house and test his urine for drugs. Burns replied, "Okay." Dewey testified that it was standard OSI procedure to ask a suspect for consent to search even when the individual had previously requested an attorney.

Dewey then presented appellant with two AF Forms 1364, entitled "Consent For Search And Seizure." After placing them "in front of" Burns, the investigator read them from top to bottom "in a very slow manner so he did understand what I was reading him." As Dewey read the forms, he also "noticed that" Burns paid attention to him; and he apprised appellant, among other things, "of the nature of the offenses of which" he was "suspected." The forms recited that a suspect did not have to give consent to a search; and Dewey even told Burns of his right to "refuse" consent to "search his house" and to refuse providing a urine sample. Indeed, Burns was given this advice twice—once as to each form—namely, the consent form to search the residence and the consent form to obtain a sample of Burns' urine for testing.

While the forms were being read, Burns did not ask to call an attorney and did not say anything or ask any questions. Dewey then asked Burns if he would sign the forms, and he signed them. Before signing the two forms, Burns still had not asked to speak to an attorney and had not asked any questions or made any comments.

Thereafter, appellant was fingerprinted and photographed. At his request, the OSI agents then took him to see his wife, "so she wouldn't worry about him." Subsequently, agents accompanied him and his wife to appellant's residence, which Burns identified for them.

During the search, Dewey found a plastic baggie and a packet of rolling papers containing suspected marijuana residue. However, no questions were directed to Burns concerning the drugs discovered there. The only question Dewey had asked him was: Who owned the automobile parked in his back yard? Burns had replied that it was not his car.

When OSI Agent Priest found in the residence bills for several long distance calls to San Antonio, he asked Mrs. Burns whether they had friends or relatives in San Antonio. He also had asked Mrs. Burns how to open certain containers on the counter, so that he would not break them. Although Airman Burns may have been in the vicinity when those questions were asked by Agent Priest, the agent asserted that his questions and comments had been directed only to Mrs. Burns or to other agents and that none was ever directed to Burns himself. Furthermore, Priest had not heard any other agents question Burns. Indeed, Priest claimed that, when the search began, either he or SSgt Dewey had reminded Airman Burns of his request for counsel and told him not to say anything.

On his motion to suppress, Airman Burns testified that he had asked the agents to call his supervisor, who could get an attorney for him, but one of the agents had told him to sit down and shut up. Moreover, the agent had unplugged the telephone and taken it out of the room.[2]

Burns then gave these reasons for signing the two consent-search forms:

When he asked me to sign, I was very nervous about the whole situation.

\* \* \* \* \* \*

Because I couldn't talk to an attorney, and I didn't have no advice on what to do, and I was just scared, and I just figured well, if I signed this here, then it will be over with as soon as possible.

---

2. According to the agents: There was a telephone in the room when Burns was placed in it, but it was removed by one of the agents who feared that Burns would contact another airman and other persons implicated in the on-going investigation. This was a standard operating procedure and was done to ensure the integrity of the investigation and not to preclude Burns from contacting an attorney.

He also was scared "[b]ecause they all was [sic] sitting there. They had guns—first they pulled guns on me on the highway, and then they all had guns in there and stuff."

Burns insisted that Dewey had not read him the entire consent-to-search form and had omitted reading from the form about the right to refuse to consent to any searches. Burns acknowledged, however, that, when Agent Priest had asked questions about the long distance telephone bills, only his wife had answered the questions. Burns further testified that when SSgt Dewey "pulled the baggie out of the garbage can," he "looked at" Burns and said—"What's this here?" "And then I just looked at him, and my wife said something to him and so did I. And I just said, 'No, don't say anything more.'" Later, he testified that—"I told ... [Dewey] to check it for fingerprints."

The military judge denied the motion to suppress "for the reasons basically stated in *Roa* in Judge Cox' and Judge Everett's opinion." She ruled that, according to *United States v. Roa,* 24 MJ 297 (CMA 1987), Burns' Fifth and Sixth Amendment rights were not violated when the agents requested him to consent to a search of his house and to give a urine specimen. However, the judge concluded that Burns' Article 31 rights had been violated when the agents asked him "to identify his house which they intended to search." Even so, she determined that inevitable discovery applied, so the error was harmless. Accordingly, the military judge ruled that the evidence obtained in the search was admissible.

The Court of Military Review upheld the military judge's denial of the motion to suppress. It stated that she had ruled correctly that *United States v. Roa, supra,* was controlling. Unpub. op. at 2, 1990 WL 61544.

## II

On this appeal, appellant reiterates the objections that he raised at trial and before the Court of Military Review concerning the validity of the consent he gave the agents to search his residence for drugs. We agree, however, with the military judge

and the Court of Military Review that our decision in *United States v. Roa, supra,* is dispositive of these contentions.

As in *Roa,* the issue here is: When a suspect in police custody requests counsel, may the police authorities request his consent to a search before he has consulted with counsel? As we observed in *Roa,* under *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986), the Sixth Amendment right to counsel

> becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," ... is needed to assure that the prosecutor's case encounters "the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656 [104 S.Ct.2039, 2045, 80 L.Ed.2d 657] ... (1987).

24 MJ at 299.

■ Therefore, we concluded that Roa's right to counsel had not been violated, because his case was still in the investigative stage when OSI agents obtained consent from him to search his locker. Indeed, no Sixth Amendment violation occurred, even though Roa had already retained counsel before the agents had requested his consent to search his locker and Roa had told the OSI agent before the request for consent that his lawyer had already "advised [him] not to discuss the investigation." *Id.* at 298.

In this case, when SSgt Dewey requested consent from Burns to search his house and to provide a urine sample, the initial investigation was still underway; so appellant's Sixth Amendment right to counsel had not yet attached. Thus, it is even clearer here than in *Roa* that no Sixth Amendment violation ever occurred, for Burns had never contacted a lawyer—much less retained one—when Dewey asked him for consent to search the house.

■ Neither were appellant's Fifth Amendment nor Article 31 rights violated when Dewey requested his consent to

search his residence and obtain a sample of his urine before Burns had the opportunity to consult with a lawyer. Again, as was explained in *Roa:*

> [T]he privilege against self-incrimination protects only testimonial evidence, not physical evidence. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Lloyd*, 10 MJ 172, (CMA 1981). *See* Mil. R. Evid. 305(d)(1). Neither Article 31, UCMJ, 10 USC § 831, nor Fifth–Amendment safeguards are infringed by a request for a consent to search, as such a request is not interrogation, and the consent thereby given is not a statement.

24 MJ at 299 (citations omitted).

As was further explained in *Roa:*

> The lead opinion points out that *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), is intended to protect the privilege against self-incrimination guaranteed by the Fifth Amendment. Article 31, Uniform Code of Military Justice, 10 USC § 831, has a similar purpose. *United States v. Howard*, 5 USCMA 186, 17 CMR 186 (1954); *United States v. Eggers*, 3 USCMA 191, 11 CMR 191 (1953). Their concern is with interrogation, rather than with unreasonable searches and seizures.
>
> \* \* \* \* \* \*
>
> Indeed, interrogation is for the purpose of eliciting from a suspect communications about the matter under investigation. However, a consent to search does not of itself communicate any information about the investigated crime; and it is not a statement regarding an offense, *see* Art. 31(b). Therefore, requesting consent to search property in which a suspect has an interest is not prohibited by his prior request for counsel, because *Edwards* provides protection only as to interrogation.

24 MJ at 301.

Because consent "is not a statement" and a request for consent is not an "interrogation," giving consent to search is a neutral fact which has no tendency to show that the suspect is guilty of any crime. *United States v. Spivey*, 10 MJ 7, 10 (CMA 1980) (Everett, C.J., concurring in the result). Thus, appellant's claim that his Fifth Amendment and Article 31 rights were violated is plagued by a faulty premise, for it seems to ignore the significant distinctions outlined by us in *Roa. See also United States v. Murphy*, 29 MJ 573 (AFCMR 1989); *United States v. Cannon*, 29 MJ 549 (AFCMR 1989). *But see United States v. D'Antoni*, 856 F.2d 975 (7th Cir.1988); *United States v. Yan*, 704 F.Supp. 1207 (S.D.N.Y.1989); *United States v. Rojas*, 655 F.Supp. 1156 (E.D.N.Y.1987).

■ Accordingly, the only real issue about Burns' consent to search his residence is whether it was given to Dewey freely and voluntarily. *See Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. White*, 27 MJ 264 (CMA 1988); Mil. R. Evid. 314(e)(4), Manual for Courts–Martial, United States, 1984. The voluntariness of one's consent "must be shown by clear and convincing evidence," Mil.R.Evid. 314(e)(5); and the determination is based on the totality of all the circumstances present. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct.2041, 36 L.Ed.2d 854 (1973); *United States v. Goudy*, 32 MJ 88 (CMA 1991); *United States v. Middleton*, 10 MJ 123, 132 (CMA 1981). The absence of counsel at the time the consent was given, the suspect's knowledge of his right to refuse consent, and the fact that consent was obtained from a suspect who was in custody at the time are significant factors to be considered. *See* Mil.R.Evid. 314(e)(5). However, none of these factors is decisive.

Upon considering all the circumstances, we conclude that the Government met its burden of proving that appellant's consents were voluntarily given. First, Burns has not alleged that he was ever ordered, coerced, intimidated, or pressured by SSgt Dewey to give consent. Similarly, there is no evidence that anything about the room

in which Burns was held was coercive. Also, according to the prosecution witnesses whose testimony we must view on appeal "in the light most favorable to the Government," *see United States v. Lowry*, 2 MJ 55, 59 (CMA 1976), Burns was given cigarettes and sodas and allowed to go to the bathroom before he gave his consent.

As the military judge found from the evidence, Burns was verbally advised by Dewey that he could refuse his consent to the search. Indeed, Dewey advised Burns twice of this right, for he twice read Burns the contents of AF Form 1364 which contains this advice. Despite Burns' claims to the contrary, SSgt Dewey testified that he had read the forms aloud very slowly and had felt that Burns fully understood what he was being told.

Moreover, Burns was a 22–year–old high school graduate who apparently had an appreciation of his constitutional rights and was capable of exercising them when he saw fit to do so. For example, when he was arrested and was surrounded by drug agents from several law-enforcement departments—who, according to Burns, had drawn guns—he requested counsel and refused to make a statement. When law-enforcement agents were searching his house, he quickly spoke up and admonished his wife not to say anything more when they appeared to be asking her questions. During the search of his residence when the agents allegedly asked him, "What's this here?", he did not seem afraid and nervous at all but retorted, "Check it for fingerprints." Thus, it appears that Burns was not awed or intimidated by law-enforcement officers.

Also significant is the fact that, immediately after Dewey had requested his consent to search, Burns appeared ready and willing to sign the two consent forms. *Cf. United States v. Ravine*, 11 MJ 325, 330 (CMA 1981). In this connection, he admitted, "I just figured well, if I sign this here, then it will be over with as soon as possi-

ble." This admission reveals that Burns had voluntarily consented to the searches in order to get it over as quickly as possible—not that his will had been overborne by Dewey.

A distinction must be made between granting consent to search property that already has been identified by law-enforcement agents and having a suspect identify property for those agents. *Edwards* precludes an investigator from asking a suspect to communicate any information as to the location of his property after he has made a request for counsel.

■ Dewey acknowledged that the residence that they searched "was identified" "[b]y the accused." Furthermore, he testified that, during the search, he had asked Burns who owned a vehicle that was parked in appellant's back yard. Although these questions did not vitiate the consent to search which Burns already had given, they did violate his Fifth Amendment rights.

■ These errors, however, were clearly nonprejudicial. As the military judge concluded, "[s]urely there was no necessity to ask the accused to identify his house since the OSI was aware of previous drug transactions which had occurred at the house and any number of base rosters would show the accused's address. Even absent the inquiry of the accused, the OSI could easily have discovered the accused's address." Furthermore, Ewbanks, the "source," knew where Burns lived, because he had been there before. As for the car in his back yard, appellant's response that he did not own the car was exculpatory; and, more important, no incriminating evidence was found therein. Likewise, Burns' reply was not at all incriminating.

Finally, during the trial, defense counsel never raised any objection that appellant's Fifth Amendment privilege against self-incrimination had been violated by any of the identification-type questions. We conclude, therefore, that no violation of appellant's

Fourth and Sixth Amendment rights took place and that any violation of his Fifth Amendment and Article 31(b) rights was inconsequential.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COX concurs.

SULLIVAN, Chief Judge (concurring separately):

My view of the propriety of police asking a suspect in custody for consent to search after counsel has been requested by that person is provided in *United States v. Roa*, 24 MJ 297, 302–03 (CMA 1987) (Sullivan, J., concurring in the result). It has not prevailed with the majority of this Court. *But see United States v. D'Antoni*, 856 F.2d 975 (7th Cir.1988); *United States v. Yan*, 704 F.Supp. 120 (S.D.N.Y.1989). Accepting the majority's totality-of-circumstances test, however, I agree with its resolution of this case.