UNITED STATES, Appellee,

v.

Cathleen L. MURPHY, Staff Sergeant,
U.S. Air Force, Appellant.

No. 63,837.
ACM 27422.

U.S. Court of Military Appeals.

Argued Oct. 3, 1990.

Decided Sept. 30, 1991.

For Appellant: *Major George P. Clark* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain Thomas E. Wand* (argued); *Colonel Robert E. Giovagnoni, Major Paul H. Blackwell, Jr., Captain Morris D. Davis* (on brief); *Lieutenant Colonel Brenda J. Hollis.*

*Opinion of the Court*

EVERETT, Senior Judge:

A general court-martial with officer members tried Staff Sergeant Cathleen L. Murphy in July 1988 at Reese Air Force Base, Texas, on the single charge that, "within the continental United States, sometime between 6 August 1987 and 20 August 1987, [she] wrongfully use[d] cocaine," in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Contrary to her pleas, she was found guilty as charged and sentenced to a bad-conduct discharge, confinement for 2 years, and reduction to airman basic. After approval of the sentence by the convening authority, the Court of Military Review affirmed the findings and the sentence, except for reducing her confinement by 9 months. 29 MJ 573, 577 (1989).

We granted review on this specified issue:

> WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY FAILING TO SUPPRESS THE TESTIMONY OF A GOVERNMENT REBUTTAL WITNESS WHERE THE GOVERNMENT HAD NOT SIGNIFIED AN INTENT TO CALL THAT WITNESS IN RESPONSE TO A DISCOVERY REQUEST.

## I

The Air Force Office of Special Investigations (OSI) received an informant's report that Murphy, a security police flight chief, had been seen using drugs in the company of a woman named Tonya or Tina at the Fast and Cool Club in Lubbock, Texas. After her squadron commander, Captain Danny Thomas, had learned of this report, he asked appellant to come in to see him. When she reported to him on August 20, 1987, she responded to his questions by saying that she had been at the Fast and Cool Club in the company of a Tina or Tonya the preceding weekend. Then he told her that she had been alleged to have used cocaine, and he asked her to consent to a urinalysis. She gave her consent; and the urinalysis tested positive for cocaine.

At appellant's trial, which began on July 12, 1988, the prosecution's case-in-chief relied heavily on the results of the urinalysis. After a government expert had testified to the drug-testing procedures that had been utilized, trial counsel called Dr. Whiting, a defense consultant or expert, "as an adverse witness" over vigorous defense objections. He testified that, in view of Murphy's reading of 507 nanograms per milliliter on the urinalysis test, she must have felt the effects of the cocaine—no matter how it was ingested. Three prosecution witnesses testified that Murphy had told them that someone might have given her laced cocaine cigarettes or put cocaine in her drink and that she wanted to know if a urinalysis would be positive under these circumstances.

The Government rested its case about 9:00 a.m. on July 18, 1988. After about an hour recess, the court reconvened; and the defense began putting on its case. Appellant was called as the first defense witness; and she testified that she had never "intentionally" or "knowingly used cocaine between" August 6 and August 20, 1987. According to her, "every other day or so" in July and August 1987 she had drunk a lot of Peruvian tea, which she had received from the girlfriend of her brother-in-law

when she had been in California. Furthermore, she suggested in her testimony that someone might have laced her drink or cigarette with cocaine, and this might have caused her urine sample to test positive for cocaine.

On cross-examination, Murphy testified that the week before her urinalysis, she had gone to several nightclubs and on August 17, 1987, had visited the Fast and Cool Club with a girl named Tonya. There, they "had been drinking," and she had received two or three Kool cigarettes from Tonya. However, she did not know whether Tonya had put anything in her cigarettes. According to appellant, someone might have put something in her drink at the Fast and Cool Club when a couple of college students came in and sat down with them. Murphy also recalled that, about the time of the urinalysis, she was taking medication for a shoulder injury and that she had taken Tylenol, which had codeine.

On redirect examination, appellant admitted that she had met Tonya previously at the Crystal Club and that Tonya had called her on the afternoon of August 17 about going out. "She gave me directions how to get down to her apartment or whatever, and I picked her up at, I think about 8 o'clock or so—8, 8:30."

The defense recalled Dr. Whiting, a toxicologist, to testify in its behalf. According to him, someone could drink cocaine-laced tea without noticing any unusual effects or could unknowingly smoke a cocaine-laced cigarette. However, he conceded on cross-examination, that, if someone had seen Murphy snort cocaine up her nose 3 days before her urinalysis, the hypothetical situations of unknowing ingestion which he had described were "irrelevant."

The defense rested its case at 3:44 p.m. on July 18, 1988. Thereupon, the prosecutor indicated that he intended to call Ms. Tonya Brooks as a rebuttal witness; he proffered that she would "testify that she was with the accused" on Monday evening, August 17, 1987, when they had "use[d] cocaine ... in an automobile outside the Cadillac Bar and" later inside a restroom at the Fast and Cool Club. The defense promptly requested that they "be permitted to interview her and do some checking on her."

When the military judge then inquired why trial counsel had not called Tonya Brooks as a witness during "the Government's case-in-chief," the explanation offered was that the OSI had not located the witness until the night before the trial started. "The statement was received approximately 11 o'clock or 2300 hours, on the 11th, the day prior to trial, by one of the OSI agents." Furthermore, according to assistant trial counsel, he had not received a copy of Tonya's statement until the afternoon of the next day—after trial had begun at 8:30 a.m. on July 12. He further explained that he had first talked to the witness about 15 minutes before the present session and that he had not been "able to talk to her" until that time, and for this reason had not used her earlier as a witness.

Defense counsel then noted that long before, on January 22, 1988, he had served on the Government "a discovery request" for "copies of all statements made by witnesses, and ... this [had been] a continuing request." Therefore, because the Government had not complied with this request by disclosing Tonya's statement, she should not be "allowed to testify." Defense counsel then stated that, if the court "ruled against" his motion, the defense should be provided a copy of the statement "and also given an opportunity to interview" the witness.

After assuring herself that Tonya's statement was not "exculpatory," the military judge ruled that she would allow the witness to testify and that, after testimony on direct, the defense would be given a recess so that they could interview Tonya before cross-examining her. The military judge acceded to a defense request that a copy of the statement be provided after direct examination; that the agent who had located Tonya be made available for an interview during the recess; and that the defense have an "opportunity to conduct a

brief background check with police agencies" to find out whether Tonya had any "prior convictions."

Tonya then testified as a prosecution witness that she and Murphy had gone "out one Monday evening." Appellant had come by and picked her up, and they had gone to appellant's "house to get some money." Murphy then came back and purchased some cocaine from Tonya's boyfriend; and she and Tonya snorted the cocaine through a straw while they were inside the car which was parked at the Cadillac Bar. After a beer or two there, they walked next door to the Fast and Cool Club, where they drank some more beer before going to a restroom and finishing off the rest of the quarter of a gram of cocaine.

After this testimony on direct examination, the military judge recessed the court from 4:10 p.m. on July 18 until 1:32 p.m. the next day. When trial resumed, defense counsel cross-examined Tonya, who stated that she was "testifying ... under a grant of immunity from the State of Texas." The defense also presented evidence that Tonya had a reputation as a liar and had been convicted of drunk driving. On redirect, Tonya testified that if she had given Murphy "a cocaine-laced cigarette ... she would have known from the time she got it, with a cigarette that doesn't have the filter in it, that something's in the cigarette. Plus, if it's cut in half you know something's wrong. And she would have tasted it ... on her tongue, on her mouth."

According to Tonya, she had talked with appellant once after they had gone out on August 17, 1987. This had been a week or two later, when Tonya had called appellant to discuss plans they had made to go out again. During that call, Murphy had told her that someone from the base who had seen them together knew that Tonya was involved "with drugs" and had told appellant "to stay away from" her. Tonya also testified that later on the Monday evening when she and appellant had gone out, she had returned to her boyfriend's apartment; but, after they had a fight, she had moved back to her mother's house. However,

Murphy had known how to reach her, because she had Tonya's mother's telephone number. Finally, Tonya testified that she had given appellant a line of cocaine 3 or 4 days before they had gone out together on August 17, 1987.

On recross-examination, the witness testified that Murphy had known about her moving back to her mother's house, because they talked about going out, and she had given Murphy her mother's telephone number. "I told her if she came by Bobby's [her boyfriend] and I wasn't there, that I would be at my mom's, and she could contact me there. That was the reason for me giving her my mother's number."

In surrebuttal, the defense offered evidence of Murphy's good military character. Moreover, they called as a witness Mr. Clifford May, who once had employed Tonya for about 3 months. According to him, he would not "believe her under oath," and "one of [his] employees didn't trust her."

Another defense surrebuttal witness was Thomas Barron who, along with Larry Shelby, Tonya, and Murphy, had been at appellant's apartment on Monday, August 17. However, he had not seen Murphy use cocaine that evening; and he had never known her to use the drug. He would believe Murphy under oath; and he stated that "her reputation for truthfulness" was "pretty good."

## II

Before the Court of Military Review, Murphy contended that the military judge had committed error by allowing Tonya Brooks to testify. In this connection, she complained that the Government had not complied with RCM 701(a)(3)(A) and 701(d), Manual for Courts–Martial, United States, 1984.

The court below concluded that, under our holding in *United States v. Trimper,* 28 MJ 460 (CMA), *cert. denied,* 493 U.S. 965, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989), trial counsel should have disclosed Tonya's name to the defense and provided the defense with a copy of her pretrial statement

because the prosecutor should have foreseen the likely relevance of her testimony. However, the court was convinced that the military judge had provided an adequate remedy for this error.

In this appeal, as in the Court of Military Review, Murphy contends that she was prevented from effectively defending against the cocaine-use charge by the prosecutor's seemingly deliberate—and certainly successful—use of a surprise eyewitness. She asserts that, despite their best efforts and the continuance they were granted, the defense team could not effectively challenge the rebuttal witness. According to the defense, Tonya's testimony was material evidence; and the sanction imposed for withholding this evidence should be its exclusion at trial. Thus, they argue, the military judge's failure to exclude the testimony was prejudicial error.

In addition, the defense contends that, in view of the prosecution's tactics of ambush, the Government should carry a heavier burden in order to sustain the conviction. Appellant insists that the testimony of Tonya Brooks, who was an alleged eyewitness of the crime, was not rebuttal evidence in the usual sense; and so, if not offered in the Government's case-in-chief, it should be excluded.

■ We agree with appellant and with the Court of Military Review that Tonya's statement should have been given to the defense before the time that trial counsel was preparing to call her as a rebuttal witness. RCM 701(a)(1)(C) requires trial counsel to "provide ... to the defense ... [a]ny sworn or signed statement relating to an offense charged in the case which is in the possession of the trial counsel." Furthermore, trial counsel is required to provide the sworn or signed statement to the defense "[a]s soon as practicable after service of charges." If that cannot be done because "extraordinary circumstances make it impracticable," trial counsel must then give the defense an opportunity "to inspect" the statement.

Months before appellant's trial, the defense had made a continuing request for discovery of any witness' statements. Pursuant to that request and in accordance with RCM 701(a)(1)(C), the prosecutor should have given a copy of Ms. Brooks' statement to the defense shortly after receiving it from the OSI on July 12, 1988. Indeed, trial counsel was in the same courtroom with defense counsel; and it certainly would have taken little effort to hand a copy of the statement over to the defense. Under no circumstances should it have taken the prosecutor a week to disclose the statement to the defense. Contrary to trial counsel's apparent belief, the disclosure requirement under RCM 701 does not depend in any way on whether trial counsel has had an opportunity to read the witness' statement or to talk to the witness.

RCM 701(a)(3)(A) requires: "Before the beginning of trial on the merits the trial counsel should notify the defense of the names and addresses of the witnesses the trial counsel intends to call: (A) In the prosecution case-in-chief; and (B) To rebut a defense of alibi or lack of mental responsibility, when trial counsel has received timely notice under subsection (b)(1) or (2) of this rule." [1] This provision would have applied if trial counsel had intended to call Tonya "in the prosecution case-in-chief." However, there is no evidence that contradicts the prosecutor's representations that he had never planned to call Tonya as a witness in his case-in-chief and, indeed, that he had neither received Tonya's statement nor talked to her until after the trial had started.

■ Ordinarily the evidence at trial is presented in this sequence:
(A) Presentation of evidence for the prosecution;
(B) Presentation of evidence for the defense;

---

1. RCM 701(b)(1) and (2) requires the defense to give the Government notice that it intends to claim alibi or lack of mental responsibility.

(C) Presentation of prosecution evidence in rebuttal;

(D) Presentation of defense evidence in surrebuttal;

(E) Additional rebuttal evidence in the discretion of the military judge; and

(F) Presentation of evidence requested by the military judge or members.

RCM 913(c)(1). We do not interpret this provision to require that the Government use in its case-in-chief every possible eyewitness or person with knowledge of the crime. Instead, the prosecutor may decide, for instance, that some of his evidence is cumulative and should not be offered unless some need arises. Under those circumstances, RCM 701(a)(3)(A) does not apply; and the prosecutor need not disclose the names of the witnesses whom he will not be calling in his case-in-chief.

█ However, a trial counsel who holds back material evidence for possible use in rebuttal to ambush the defense runs a risk. The military judge has the responsibility to "exercise reasonable control over the proceedings to promote the purposes of" the Rules for Courts–Martial and the Manual for Courts–Martial. RCM 801(a)(3); *cf.* RCM 102(a). In the exercise of that control, a military judge is entitled to exclude prosecution evidence in rebuttal, if the judge concludes that it should have been offered in the prosecution case-in-chief and has not fulfilled the purpose of rebuttal— namely, "to explain, repel, counteract, or disprove the evidence introduced by the opposing party." *See United States v. Cleveland,* 29 MJ 361, 363 (CMA 1990). Thus, the military judge, in her discretion, could have excluded the testimony of Tonya Brooks on the ground that it was not proper rebuttal and should have been offered as part of the prosecution case-in-chief.

█ Although we agree with the defense that trial counsel violated RCM 701(a)(1)(C) by not giving Tonya's statement to the defense at an earlier time, we are not convinced that exclusion of her testimony was necessary to remedy the error. As we recently observed in *United States v.*

*Trimper, supra* at 468, RCM 701(g)(3) allows the military judge to choose among several remedies in order "to redress a [government] failure to disclose evidence." These remedies include "ordering discovery, granting a continuance, [and] excluding the evidence."

Here the military judge granted appellant a continuance for several hours; required trial counsel to deliver to defense a copy of Tonya's statement; and gave defense counsel an opportunity to interview Tonya before cross-examining her. The circumstance that, during the continuance, defense counsel were able to conduct a background investigation of the witness, obtain a certified copy of her conviction for driving under the influence, and locate a witness who testified in surrebuttal about Tonya's lack of truthfulness tends to show that the prosecution's omission could be remedied without excluding the witness' testimony. Indeed, in defense counsel's reply to the staff judge advocate's post-trial recommendation to the convening authority, the only defense complaint was the lack of sufficient time to obtain evidence about Tonya's reputation and veracity.

Appellant has not shown us that she suffered any specific prejudice from the delay in receiving a copy of the statement by Tonya Brooks; and we have discovered none from our study of the record. Moreover, we conclude that the testimony given by Tonya Brooks would have been almost equally damaging to the defense even if it had been presented as part of the government case-in-chief, rather than in rebuttal. Most important, we are sure that the defense had adequate opportunity to controvert the belatedly introduced evidence. *Cf. United States v. Sadler,* 488 F.2d 434, 435 (5th Cir.), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974).

In *Trimper,* we observed that, if the military judge had accepted the defense contention that nondisclosure was part of a cunning prosecutor's scheme to ambush appellant, the grounds for excluding the evidence would be stronger. Although in this case the prosecution used some unorthodox

tactics—at least one of which was criticized by the court below [2]—we are unconvinced that the absence of disclosure about Tonya and her statement was a trick by the prosecution.

Furthermore, the defense should not have been surprised that the Government might locate Tonya and use her as a witness sometime during the trial. From the time of the first report of Murphy's cocaine use, the name of Tonya was associated therewith. Indeed, appellant herself admitted to her squadron commander that she had associated with "Tonya or Tina" at a club. At an earlier point, Murphy had stated to a friend that a female companion might have laced her drink or cigarette with cocaine; and Murphy testified at trial that she had been with Tonya at a club on the night of August 17, 1987. Thus, Tonya did not spring "full blown from the head" of trial counsel, as appellate defense counsel seem to intimate.

The defense was aware of Tonya Brooks' existence and cannot really complain of foul play because the Government managed to locate her. Indeed, it seems that Murphy knew how to contact and locate Tonya all along, while the Government was frantically trying to find her. Under these circumstances, appellant deserves little judicial sympathy.

### III

Although we decide the granted issue against appellant, our review of the record has revealed a matter which was raised at trial and gives us great concern. Captain Danny Thomas called Murphy in to see him after he had learned of an informer's report to the OSI that appellant had been using cocaine with another woman. Apparently in coordination with the OSI, he had prepared three questions to ask her. When she reported in, Captain Thomas asked her these questions; but he did so without giving her a warning under Article 31(b), UCMJ, 10 USC § 831(b). In his view, such

a warning was not required because she had not yet become a "suspect."

■ Unfortunately, we have difficulty in accepting this limited construction of the term "suspect." After a commander or supervisor has received a specific report that a particular subordinate has committed a crime and the commander then prepares to ask specific questions suggested by law-enforcement agents, it is unrealistic to say that the person to be questioned is not a "suspect."

After answering three questions by Captain Thomas, Murphy was asked to consent to a urinalysis. According to Thomas, if her answers had been different, he would not have ordered the urinalysis; but because in some way her responses seemed to corroborate the report received by the OSI, he decided to go forward with the urinalysis.

We recognize that consent to a urinalysis involves Fourth Amendment—not Fifth or Sixth Amendment—rights. *Cf. United States v. Burns*, 33 MJ 316 (CMA 1991); *United States v. Roa*, 24 MJ 297 (CMA 1987). Also, the Sixth Amendment right to counsel is not involved in the preliminary stage of a criminal investigation. Nonetheless, in light of Thomas' acknowledgment as to the basis for his consent request, we believe it is appropriate to consider whether the consensual urinalysis was tainted by the violation of Murphy's Article 31 rights. Moreover, initially the Court of Military Review should deal with this issue.

### IV

The decision of the United States Air Force Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court to determine whether the questioning of appellant without the required statutory warning precluded admissibility of the urinalysis results. If the answer is in the negative, the record will be

---

2. The Court of Military Review expressed distaste for the prosecutor's calling Dr. Whiting as a government witness during the prosecution case-in-chief. 29 MJ 573, 577 (1989).

returned directly to this Court. Otherwise Article 67(a), UCMJ, 10 USC § 867(a) (1989), will apply.

Judge COX concurs.

SULLIVAN, Chief Judge (concurring):

I write only to note my separate opinions in *United States v. Burns*, 33 MJ 316 (CMA 1991), and *United States v. Roa*, 24 MJ 297, 302 (CMA 1987).