UNITED STATES

v.

**Staff Sergeant Cathleen L. MURPHY, FR476–76–3060, United States Air Force.**

**ACM 27422 (f rev).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 20 July 1988.

Decided 11 Dec. 1992.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens and Major Alice M. Kottmyer.

Appellate Counsel for the United States: Lieutenant Colonel Brenda J. Hollis, Major Paul H. Blackwell, Jr., and Captain Thomas E. Wand.

Before LEONARD, JAMES, and JOHNSON, Appellate Military Judges.

## OPINION OF THE COURT UPON FURTHER REVIEW

JOHNSON, Judge:

A general court-martial convicted Staff Sergeant Murphy, contrary to her pleas, of one use of cocaine. The members sentenced her to a bad-conduct discharge, confinement for 2 years, and reduction to E–1. The convening authority approved the adjudged sentence.

We previously reviewed four issues raised by appellant and found them all without merit.[1] However, we found appropriate only so much of the sentence as extended to a bad-conduct discharge, confinement for 15 months, and reduction to E–1. The Court of Military Appeals found appellant's Article 31, 10 U.S.C. § 831, rights were violated in an interview with her commander, at the conclusion of which appellant consented to a urinalysis that produced the primary evidence of her drug use.[2] Upon returning the record for fur-

---

1. *United States v. Murphy,* 29 M.J. 573 (A.F.C.M.R.1989).

2. The military judge found that Murphy was not a suspect at the time her commander questioned her. The Court of Military Appeals held she

ther review, the Court of Military Appeals asked us to determine "whether the questioning of appellant without the required statutory warning precluded admissibility of the urinalysis results." *United States v. Murphy*, 33 M.J. 323, 329 (C.M.A.1991). We have done so, and we conclude the failure to warn appellant of her Article 31 rights did not make the urinalysis results inadmissible.

## FACTS

In August 1987 appellant was a member of the security police squadron at Reese Air Force Base, Texas. Captain Thomas was her squadron commander and the chief of security police. On 17 August 1987, an Air Force Office of Special Investigations (OSI) agent told the security police superintendent, Senior Master Sergeant Spahr, that an informant had reported appellant had used drugs. The agent also suggested specific questions to ask appellant. On 18 August 1987, Sergeant Spahr and appellant's supervisor, Master Sergeant Holiman, told Captain Thomas of the drug use allegation. They told him the informant stated appellant was at the Fast and Cool Club with a woman named Tonya or Tina on the previous Saturday night, and appellant had used some illicit drug.

Captain Thomas directed that appellant be told to come in to see him. She was off duty at the time, and a message was left on her home answering machine to contact Captain Thomas' office. She called 19 August 1987 and arranged to meet with Captain Thomas before reporting for duty on the afternoon of 20 August 1987.

Appellant reported to Captain Thomas as scheduled. Her supervisor, Sergeant Holiman, was also present. Captain Thomas told appellant he needed to ask her some questions concerning her whereabouts on the previous Saturday night. He then asked her if she had been at the Fast and Cool Club. She answered, "Yes."[3] He asked her if she was with Tina, or Tonya. She again answered, "yes, Tonya." He then asked who Tonya was, and she said a civilian female that she had met. These were the questions suggested by OSI. Having confirmed these details of the informant's story, Captain Thomas told appellant he had received an allegation of drug use by her and asked if she was willing to take a urine test. She agreed. Sergeant Holiman accompanied appellant to the base hospital where she provided a urine sample, which tested positive for cocaine.

Captain Thomas did not advise appellant of her Article 31 rights at any time during this interview. Captain Thomas testified he initially viewed the OSI's allegation as rumor or speculation and he did not suspect appellant of any wrongdoing.[4] He said that if she had told him she was on duty the night in question, she was not at the Fast and Cool Club, or she did not know Tonya, he would not have asked her to take a urinalysis. Also, if she had asked to stop the interview and see a lawyer, he

was a suspect, triggering the requirement for Article 31 warnings. This Court's previous decision upheld the military judge's voluntary consent to search determination without examining the Article 31 issue.

3. Appellant testified that she was asked about her whereabouts on Monday, 17 August 1987, rather than Saturday, 15 August 1987. This variance between her recollection and that of Captain Thomas and Sergeant Holiman is of no consequence to the issue before us.

4. A few months earlier Captain Thomas had called appellant into his office to discuss a previous report that she was involved with drugs. The nature and extent of that conversation were not developed in any detail at trial, but the allegation was apparently treated as unfounded.

Appellant was continued in her security police law enforcement duties, and just before her urinalysis report was received she was rated "outstanding" on a performance report. Appellant testified that Captain Thomas referred to the prior allegation during the interview in which she gave consent to search. Captain Thomas testified that it was not mentioned. This question was not addressed in Sergeant Holiman's testimony. In her findings at trial, the military judge addressed the contradictions between appellant's testimony and that of Captain Thomas and Sergeant Holiman. She found appellant's testimony on these issues to be "totally self-serving and opportune in hindsight," and found the testimony of the others to be "totally credible ... forthright and definite." We agree. We find that no mention of the prior allegation was made.

would have stopped, advised her of her rights, and given her an opportunity to see a lawyer. He further stated appellant's answers confirming her presence in the Fast and Cool Club with Tonya on Saturday night did not, in themselves, confirm the allegation of drug use. Because of her apparent lack of concern, he testified his attitude at the time was, "as far as I'm concerned, it's still not true."

## LAW AND ANALYSIS

Military Rule of Evidence 314(e)(5) requires clear and convincing evidence of voluntariness for the admission of evidence based on a consent to search. A consent to search is valid if the totality of the circumstances show that the consent was freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Frazier,* 34 M.J. 135 (C.M.A.1992); *United States v. Burns,* 33 M.J. 316 (C.M.A.1991); *United States v. Goudy,* 32 M.J. 88 (C.M.A. 1991); *United States v. McClain,* 31 M.J. 130 (C.M.A.1990); *United States v. Roa,* 24 M.J. 297 (C.M.A.1987).

No single factor was identified in these cases as being decisive, but some of the circumstances mentioned have included:

(1) The degree to which the suspect's liberty was restricted (under escort, under arrest or apprehension, held in the office of law enforcement agents, called to the commander's office, etc.).

(2) The presence of any coercion, promises, direct orders, threats (including threats that if consent to search is withheld, an authority to search will be obtained or a command-directed urinalysis will be ordered), or other forms of intimidation or pressure.

(3) Awareness by the suspect that he or she had the right to refuse to consent to the search (as established by direct testimony or by oral or written warnings, in the light of inferences drawn from the suspect's age, experience, education, training, and intelligence).

(4) The suspect's demeanor and apparent mental state (sober, calm, confident, cooperative, unconcerned; or confused, intimidated, tired, intoxicated, reluctant, anxious, etc.).

(5) Whether the suspect had consulted with counsel.

(6) The coercive effect of any prior violations of the suspect's constitutional or statutory rights (e.g., rights to legal counsel, or rights against self-incrimination under Article 31 or the Fifth Amendment).

We have examined the record of trial in appellant's case and weighed all the relevant facts and circumstances. Appellant was called to her commander's office, and she had a military duty to appear. She testified there were a variety of possible reasons for being called there, including future assignments or matters having to do with her subordinates. She reported formally, by standing at attention in front of his desk and saluting; he returned her salute and told her to be seated. She had drawn her sidearm for performance of her security police duties; she was not disarmed for the interview. The commander was not armed. The commander spoke to her in a normal conversational tone; there was nothing intimidating or coercive in his manner.[5] No promises, direct orders, threats, or other forms of intimidation or pressure were used.[6] Captain Thomas did

---

5. In *Goudy, supra,* the Court of Military Appeals rejected an argument that any request for a consent to search made by a commander to a subordinate who has reported formally in the commander's office should be presumed to be involuntary because the circumstances make the request an "implied order." While the court rejected any such "bright-line rule," it expressly considered the setting as part of the totality of the circumstances.

6. Appellant testified Captain Thomas told her that if she did not consent to a urinalysis, he

would order a command-directed urinalysis. Both Captain Thomas and Sergeant Holiman denied this was said. In her findings at trial, the military judge addressed the contradictions between appellant's testimony and that of Captain Thomas and Sergeant Holiman. She found appellant's testimony to be "totally self-serving and opportune in hindsight," and found the testimony of the others to be "totally credible ... forthright and definite." We agree. We have weighed the evidence carefully, and we

not tell appellant expressly that she had the right to refuse to consent to search, but it was implicit in the phrasing of his request that she had that right. Appellant helped complete the consent to search form, which contains a warning that consent may be refused.[7]

Appellant was 30 years old. She had completed high school and some college courses. She had been in the Air Force for over 10 years. She spent her entire career in the law enforcement career field and progressed well in the career field. She was serving as a law enforcement flight chief and had completed consent for search forms in the course of her duties. She received training on search and seizure and provided such training to her subordinates. We find that appellant was well aware she had the right to refuse her consent for search.

Throughout appellant's interview with her commander and her completion of the consent form, she asked no questions and showed no hesitancy, uncertainty, or concern. She did not ask to speak with counsel or anyone else. Sergeant Holiman testified he accompanied appellant to the hospital and remained with her for the 1 to 2 hours it took to collect the urine sample. During that time, appellant voiced no concern or doubt about what she was doing. She made no request to call anyone on the telephone or to leave the hospital.

The primary remaining consideration is the effect of Captain Thomas' failure to give appellant a warning of her rights under Article 31, UCMJ, before questioning her. Her responses were in themselves not incriminating, but they corroborated certain details of the OSI informant's report. They were part of the chain of events that

led to appellant's urinalysis, since Captain Thomas testified that he would not have asked her to consent to a urine test if she had denied these aspects of the informant's report.

There is no general requirement that a suspect be informed of his or her Article 31 rights before being asked to consent to search. *Frazier, supra.* Article 31 warnings become an issue in consent searches only when a law enforcement agent or other person in authority has asked the suspect questions without a proper Article 31 warning during the events preceding the consent to search. In such cases, the unwarned statements must be considered as part of the totality of the circumstances in deciding whether the suspect's consent to search was voluntary.

■ Appellant was a suspect, and she received no Article 31 warning before her commander asked her questions. The fact that appellant made these unwarned statements during the events leading up to her consent to search must be weighed for their likely impact on that decision. On their face, the facts she related were innocent. Captain Thomas did not tell her that her responses matched the informant's report. Her only complaint is that if she had been told she was suspected of an offense, or had been warned of her Article 31 rights, she would have known she was under suspicion and would not have consented to the search. This position is contradicted by the undisputed fact that Captain Thomas advised appellant before asking for her consent to the search that he had received allegations of drug use by her. There is nothing in the record that indicates appellant's decision to consent to the search was

---

find that no mention of a command-directed urinalysis was made.

**7.** The Air Force Form 1364 contained the following printed language:

I know that I have an absolute right to give my consent to a search. I understand that, if I do consent to a search, anything found in the search can be used against me in a criminal trial or in any other disciplinary or administrative procedure. I also understand that, if I do not consent, a search cannot be made without a warrant or other authoriza-

tion recognized in law.... Before giving my consent, I carefully considered this matter. I am giving my consent voluntarily and of my own free will, without having been subjected to any coercion, unlawful inducement and without any promise of reward, benefit, or immunity having been made to me.

The first sentence of this form is certainly inartful, but read together this warning makes it clear to anyone of reasonable intelligence that they have a right to refuse their consent.

influenced in any way by the responses she made to her commander's questions. In the circumstances of this case we find Captain Thomas' failure to give Article 31 warnings did not affect the voluntariness of appellant's consent to search. Weighing the totality of the circumstances, we find her consent was voluntary, by clear and convincing evidence.

We are mindful that evidence derived from violations of Article 31 warning requirements is inadmissible. *United States v. Churnovic*, 22 M.J. 401 (C.M.A.1986). In this case, however, we find that appellant's consent to search was not "derived" from her responses to unwarned questioning. As just discussed, her responses did not affect the voluntariness of her consent. No information she provided was used to locate any other evidence. There is no evidence as to whether Captain Thomas would have asked appellant for her consent if she had invoked her Article 31 rights (although we infer he would have, since he testified he was prepared to drop the inquiry only if she answered that she was not at the Fast and Cool Club at the time in issue, or did not know Tonya). There is insufficient causal connection, on the specific facts of this case, to conclude that the urine test was tainted by Captain Thomas' failure to give an Article 31 warning.

In accordance with the mandate of the Court of Military Appeals, the record will be returned directly to that Court.

Judge JAMES concurs.

LEONARD, Senior Judge (dissenting):

I dissent from the majority's holding finding the results of appellant's urinalysis admissible in her court-martial. Using a totality of the circumstances rationale, I cannot find clear and convincing evidence that appellant voluntarily consented to give the urine sample used for the urinalysis.

In determining whether a consent to search is voluntary or mere acquiescence to authority, the facts and circumstances surrounding the giving of the consent are critical. Although I generally agree with the facts presented in the majority opinion, I find some differences that impact upon my application of a totality of the circumstances analysis.

First, appellant's meeting with her commander to discuss allegations of her drug use was clearly conducted in terms of an enlisted person ordered to report to her commander.[8] Appellant was notified by telephone to come and see her commander immediately or as soon as possible. Captain Thomas testified he considered the request to come and see him an order for appellant to report to his office. Appellant walked into Captain Thomas' office, saluted him, and remained at attention until he gave her further direction. She reported to Captain Thomas with her supervisor Master Sergeant Holiman. According to the testimony of appellant and Holiman, appellant could not leave until Captain Thomas dismissed her.

Second, although he hedged as to whether appellant's responses to his unwarned questioning verified the allegation, Captain Thomas testified her responses confirmed the alleged facts and circumstances of appellant's drug use as reported to the Air Force Office of Special Investigations (OSI) by an unknown informant.

Third, the majority finds implicit in the phrasing of Captain Thomas' request for the urinalysis a right to refuse to consent. That finding stretches the evidence. Captain Thomas ordered appellant to report to his office. She reported in a formal manner and was not free to leave until he dismissed her. Captain Thomas asked her specific questions about her whereabouts on a particular evening. Immediately after hearing her responses, he told her there was an allegation she had used drugs and

---

**8.** I agree with the majority that there is no presumption of involuntariness merely because a request for consent occurs following a subordinate reporting to a commander. However, the majority also correctly notes that the location and the circumstances leading up to a request for consent are part of the totality of the circumstances. *United States v. Goudy*, 32 M.J. 88, 91 (C.M.A.1991). Under the circumstances of appellant's case, I accord more weight to the circumstances of appellant's reporting to her commander than the majority.

asked for her consent to a urinalysis. Finding an implicit right to refuse contained in this sequence of events is difficult.[9]

The Court of Military Appeals found Murphy was a suspect and should have been advised of her Article 31 rights before being questioned. Upon returning her record for further review, they asked us to determine "whether the consensual urinalysis was tainted by the violation of Murphy's Article 31 rights." *United States v. Murphy*, 33 M.J. 323, 329 (C.M.A.1991).

Before *Murphy*, the law seemed well established that a consent to search and seizure is valid if clear and convincing evidence of the totality of the circumstances show the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Frazier*, 34 M.J. 135 (C.M.A.1992); *United States v. Burns*, 33 M.J. 316 (C.M.A.1991); *Goudy*, 32 M.J. at 90; *United States v. McClain*, 31 M.J. 130 (C.M.A.1990); Mil.R.Evid. 314(e)(5). The language of *Murphy* could be construed to require a taint attenuation analysis as a step separate from a totality determination.

In *Frazier*, Chief Judge Sullivan addressed an Article 31 violation in the context of consent to a search. He treated the Article 31 violation in *Frazier* as "a factor to be considered in determining the voluntariness of appellant's later consent to search." 34 M.J. at 138 (concurring in the result).[10] Although the facts of *Frazier* differ from those before us, I believe the rationale of Chief Judge Sullivan's opinion applies. *Frazier*'s supervisor suspected Frazier of having stolen some money from his roommate and the supervisor asked Frazier whether he had stolen the money. He denied it. The supervisor then asked to see Frazier's wallet and Frazier gave his wallet to the supervisor. The wallet contained large bills approximating the amount allegedly stolen. In finding Frazier's consent voluntary, Chief Judge Sullivan's analysis of the Article 31 "factor" focused on the "non-incriminating non-coerced nature" of Frazier's responses. *Id.*

Following this rationale, I would examine any "taint" from Murphy's Article 31 violation as a factor bearing upon the voluntariness of appellant's consent.[11] In analyzing this factor, I would focus on (1) the length of time between the violation and the consent, (2) the intervening circumstances, (3) the flagrance of the violation,[12] (4) the coer-

---

9. In footnote 7, the majority sets forth printed language of Air Force Form 1364 concerning the "absolute right to give my consent to a search" afforded the person asked for a consent to search. The wording of this form is not merely "inartful." It is deliberately misleading and should be changed without delay.

10. Judge Cox wrote the lead opinion and found that the viewing of the contents of Frazier's wallet was a lawful search since Frazier voluntarily gave up the wallet without any coercion. Judge Cox found there was no interrogation of Frazier prior to the request to see the wallet. The remaining members of the Court did not participate.

11. In *Burns*, Senior Judge Everett analyzed the relationship of the Fourth, Fifth, and Sixth Amendment to a consent to search situation. He noted that the Fifth and Sixth Amendments right to counsel and Article 31 protections were not applicable to a request for consent to search in the course of an initial investigation of an offense. *Burns*, 33 M.J. at 319, 320; *United States v. Roa*, 24 M.J. 297, 299 (C.M.A.1987). He found that the Fifth Amendment and Article

31 did not apply because consent was not a statement and a request for consent was not interrogation. *Burns*, 33 M.J. at 320. The Sixth Amendment right to counsel was found inapplicable when the government was still engaged in an initial investigation and had not made any formal accusations of criminal conduct. *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984); *Burns*, 33 M.J. at 319; *Roa*, 24 M.J. at 299. Judge Everett concluded the only real issue is a totality of circumstances analysis of whether the consent to search was given freely and voluntarily. *Burns*, 33 M.J. at 320; Mil.R.Evid. 314(e)(4).

12. These three factors have been considered by a number of courts as circumstances bearing on a totality determination. *See Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (illegal arrest preceded warned confessions); *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir.1991) (illegal arrest preceded consent); *United States v. Walker*, 933 F.2d 812, 818 (10th Cir.1991), *reh'g denied* 941 F.2d 1086 (10th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (illegal detention preceded consent).

cive nature of the unwarned questioning, and (5) the incriminating nature of the responses. However, as the majority correctly points out, consideration should not be limited to the circumstances of the Article 31 violation. This factor must be considered with all other relevant factors, including whether the consent was requested in a custodial setting; whether the suspect was advised of her right to refuse to consent; the tone of voice and demeanor of the requestor; and the age, rank, education, and experience of the person giving the consent. *Burns*, 33 M.J. at 320, 321; *Goudy*, 32 M.J. at 90–91.

In my view, the Article 31 violation and its circumstances injected an element of subtle coercion that raised serious doubts about Murphy's ability to give a free and voluntarily consent. Captain Thomas ordered Murphy to report to his office. Once she reported, he then conducted a unwarned interrogation of specific questions designed to verify her drug involvement. As soon as her answers confirmed the suspicions of the OSI, Captain Thomas requested she consent to give a urine sample. No break occurred in the sequence of events, and no one told Murphy she had a right to refuse to give her consent. I find a direct nexus between Captain Thomas' Article 31 violation and appellant's consent to give the urine sample.

No intervening circumstances occurred to disrupt this direct nexus. In fact, the only intervening circumstance served to intensify the coercive atmosphere rather than alleviate it. After Murphy's responses, Captain Thomas highlighted the incriminating nature of her unwarned responses by immediately telling her someone had alleged she had been involved with drugs. This sequence of events placed Murphy in a situation where she could have reasonably felt compelled to defend herself against statements just taken from her in violation of her Article 31 rights.

While Captain Thomas' unlawful interrogation could be an innocent technical viola-

tion, the circumstances seem to indicate otherwise. I am particularly concerned that agents of the Air Force Office of Special Investigations suggested asking the specific unwarned questions. The government did not provide any evidence concerning the purpose or context of the suggested questions to dispel the suspicious nature of this method of interrogation. Second, the method of interrogation becomes even more suspicious considering the questions were asked by a security police squadron commander to investigate a second allegation of drug involvement. Captain Thomas may have acted with good intentions, but such an obvious disregard of Article 31 responsibilities is troubling.[13] I would find violation of appellant's Article 31 rights intentional and flagrant.

The majority finds appellant's responses to Captain Thomas' questions not incriminating. I do not agree. An informant reported to the OSI that appellant had used cocaine at the Fast and Cool Club with a civilian named Tina or Tonya over the previous weekend. Captain Thomas testified he asked appellant specific questions to verify this allegation of illegal drug use. These questions were designed to verify all the surrounding facts of the informant's report without directly asking appellant whether she illegally used cocaine. Captain Thomas also testified appellant's responses verified the facts reported to him of the circumstances of the allegation. Because of this verification, he asked her consent for a urine sample. He testified that, if her responses had not verified the facts reported to him, he would not have asked for her to give a urine sample. Appellant's responses placed her at the scene of the crime, at the time the crime reportedly occurred, and with the person alleged to be her accomplice. Her responses created an inference that she committed the crime reported by the informant. Under these circumstances, I find the responses incriminating.

---

13. It is ironic that Captain Thomas testified he would have given her rights advisement only after she had invoked her rights.

In addition to the coercion arising from the direct nexus to Captain Thomas' unwarned questioning, I find other evidence of coercion present in the circumstances of appellant's consent. First, the ordering of appellant to report to her commander's office with her supervisor for questioning set the stage for acquiescence rather than voluntary consent. Appellant and her supervisor knew she could not leave until her commander released her. Second, despite the obvious inference of coercion from such a setting, neither Captain Thomas nor Master Sergeant Holiman ever mentioned she could refuse to consent. Alone, this other evidence of coercion would not cause me to find appellant's consent involuntary. However, when it is combined with the circumstances of Article 31 violation, it further undermines the government's position.

Usually, Murphy's age, rank, and experience could help support a finding of valid consent, *Burns*, 33 M.J. at 321; *Goudy*, 32 M.J. at 91, but under the circumstances of this case, these factors may have increased her compelling interest in defending herself. What wrongly accused NCO would refuse to cooperate with her commander and supervisor and help clear her good name? How could a law enforcement NCO, who has already made statements to the chief of security police verifying the circumstances of alleged drug use, reasonably believe that her denial of consent would be perceived as anything other than an admission of guilt? This belief could be even stronger when the NCO has already faced the same commander concerning a prior allegation.[14]

There is no evidence that Captain Thomas or Master Sergeant Holiman ordered Murphy to give consent, but a totality of circumstances analysis of voluntariness goes beyond an examination of explicit actions and statements. The subtle and implicit pressures commanders can bring to bear upon an airman are a proper matter for concern. To find a free and voluntary consent we must be satisfied by *clear and convincing evidence* that subtle and implicit pressures of command have not overwhelmed the airman giving the consent. *United States v. Goudy*, 32 M.J. 88, 91 (C.M.A.1991); *United States v. Ward*, 19 M.J. 505, 507 (A.F.C.M.R.1984); Mil.R.Evid. 314(e)(5). After considering all the circumstances and paying particular attention to the background and effect of the unwarned interrogation, I do not find clear and convincing evidence that Murphy's consent to the urinalysis was freely and voluntarily given.

Because the urinalysis results were the keystone of the government's case, appellant's conviction cannot stand.[15]

I would set aside the findings of guilty and the sentence.

---

**14.** Although Captain Thomas testified he did not mention the prior allegation of drug involvement by appellant, both he and appellant were well aware this was the second time she had been called before him to answer to drug related allegations.

**15.** With the exception of three brief witnesses, the government's entire case-in-chief involved the urinalysis.

These three witnesses testified about statements made by appellant while the urinalysis results were pending. Her statements consisted of concerns that she may have been given drug laced cigarettes and questions about the affect the lacing could have on the urinalysis. Tonya Brooks was called as a witness in rebuttal and testified that she used cocaine with appellant during the charged time period. The defense was able to mount a substantial attack on Ms. Brooks credibility. In my opinion, the testimony of Ms. Brooks would not establish appellant's guilt beyond a reasonable doubt.