**UNITED STATES, Appellee,**

v.

**Stephen A. GOUDY, Lance Corporal, U.S. Marine Corps, Appellant.**

**No. 64,164.**

**NMCM 890199.**

U.S. Court of Military Appeals.

Argued Nov. 27, 1990.

Decided Feb. 5, 1991.

For Appellant: *Lieutenant Wade W. Parrish,* JAGC, USNR (argued); *Lieutenant Jacob R. Walker,* JAGC, USNR (on brief).

For Appellee: *Major Laura L. Scudder,* USMC (argued), *Commander Thomas W. Osborne,* JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

A special court-martial (military judge alone) convicted appellant, contrary to his pleas, of stealing a television, a graphic equalizer, and assorted clothing of a fellow servicemember—violations of Article 121, Uniform Code of Military Justice, 10 USC § 921. Thereafter, the judge sentenced appellant to a bad-conduct discharge, confinement and forfeiture of $447.00 pay per month for 6 months, and reduction to the lowest enlisted grade. The convening authority approved these results.

In its review, the Court of Military Review specified for briefs and argument an issue that addresses the same matters upon which we ultimately granted review. In the end, though, the court affirmed the findings and sentence in a memorandum opinion.

On appellant's petition, we agreed to consider whether his consent to a search of his wall locker, his car, and his living quarters was voluntary under the totality of the circumstances and, if it was not, whether the illegal search tainted his subsequent

written and testimonial admissions.[1] *See* Mil.R.Evid. 311, Manual for Courts–Martial, United States, 1984. The Government has conceded in this Court that, if the consent was involuntary, appellant's admissions were, indeed, tainted. Accordingly, the beginning and the end of our inquiry is whether appellant's consent was voluntary. We now decide that it was.

### I

Major Harrison, appellant's company commander, suspected that appellant had stolen a number of items of personal property belonging to other members of the unit. Apparently, appellant earlier had made incriminating statements to two people concerning their missing property, and Harrison was aware of these statements. Accordingly, he arranged for Sergeant Laird, an apprentice investigator with the Criminal Investigation Division, to come to his office to look into the matter.

When appellant arrived for work at 6:30 a.m., his supervisor advised him that he was to report to Major Harrison's office at 8:00 a.m.; in the meantime, he was told to carry out his normal duties but was admonished that he would be under the "strict guide" of one of the company's sergeants. Specifically, although appellant's usual routine was undisturbed, he was not to go anywhere or do anything except in the presence of the named sergeant.

At the appointed hour, the sergeant escorted appellant to Harrison's office, where appellant reported to his commander in the position of attention. Laird and Staff Sergeant Hudson, another investigator, also were in the room, and Harrison introduced them to appellant. Preliminarily, Harrison advised appellant that he suspected him of selling a televison that did not belong to him and of stealing personal property of other Marines in the barracks. He asked generally whether appellant understood his rights under Article 31 of the Code, 10 U.S.C. § 831, to which appellant replied that he did.

Harrison observed that the best way to clear up the matter would be to search appellant's room. He advised appellant that "he needed" his "consent" to do so and suggested that, if appellant "had nothing to hide, there was no reason" not to give that consent by signing a consent-to-search form.

As is implied in our granted issues, of course, appellant did ultimately sign the form. After Harrison had made the comments set out above, appellant responded, " 'Okay,' or 'Yes,' something like that, in that nature," and Harrison "then ... just gave him to" Laird. Laird described what happened at that point:

> I filled it [the consent form] out and I went step-by-step over all this with him, telling him where to initial, where I had marked out parts that had nothing to do with what we were looking for. Had him read it, then I asked him, "Do you understand everything about this form?" That he didn't have to give his consent to search because that part of the form, it says that you don't have to give your consent to search, and he said, "Okay."

Finally, just before appellant signed the form, Laird again asked, " 'Do you understand everything on this form?', and he said, 'Yes.' "

Appellant acknowledged that he was not under arrest or apprehension at the time, only under escort. While Harrison's voice was "authoritative," appellant conceded that at no time did Harrison raise his voice, scream, or make any threats or promises. Laird described Harrison as "cool, calm, and collected. Just wanted to find out

---

1.

### I

WHETHER APPELLANT'S CONSENT TO SEARCH HIS WALL LOCKER WAS INVOLUNTARY IN VIEW OF THE "TOTALITY OF THE CIRCUMSTANCES" UNDER WHICH IT WAS OBTAINED.

### II

WHETHER BOTH APPELLANT'S WRITTEN AND TESTIMONIAL ADMISSIONS WERE POISONED BY THE ILLEGAL SEARCH OF APPELLANT'S LOCKER SO AS TO PRECLUDE THEIR CONSIDERATION IN DETERMINING HIS GUILT OF STEALING THE GRAPHIC EQUALIZER AS DESCRIBED IN SPECIFICATION 3 OF CHARGE II.

what was going on." Laird also testified that appellant's physical and mental appearance seemed normal at the time, with no indications that he was under the influence of any alcohol or drug that might impair his understanding.

Appellant, however, testified that he took Harrison's request for consent as an "implied order." He explained that an "implied order" is "[s]omething you don't have to do, but sometimes it would be better if you did." He amplified that "you don't have to" obey an implied order, but "presumably" "it would go better for you if you did."

Additionally, appellant could not recall specifically being advised by Laird, while going over the form, that he did not have to give his consent. The prosecutor pointed out that he had initialed and signed the form that gave this advice, but appellant asserted that he had not read the form. When asked why, he responded, "It didn't seem relevant to me, sir." In an effort to better define the ambiguity of this answer, the prosecutor initiated the following exchange:

Q. It didn't seem relevant to you?

A. I was being told that it was a consent to search. A search would be the best way to clear the incident. I wasn't concerned with what the statement said. I understood that it was a consent to search.

Q. So basically you knew that the best chance, the best way to get out of this, you thought was the consent to search. Is that correct?

A. That's what I was instructed by the CO.

Q. You thought it was going to help you out?

A. The CO said that if I didn't have anything to hide there was no reason to not consent to search, sir.

Q. And that was the reason why you consented to the search?

A. That is true, sir.

Q. Because you didn't think you had anything to hide?

A. Yes, sir.

Appellant's stated motivation for signing the consent form is probably best summed up in this brief colloquy between himself and his counsel at the end of his testimony:

Q. Why did you sign this consent-to-search form?

A. Because I was instructed that if I had nothing to hide then there was no reason why I should not. Therefore implying that I should sign it.

Q. Did the Major tell you he needed it?

A. Yes, sir, he did.

Q. When superior officers tell you they need something, what do you do?

A. I do what they ask, sir.

## II

■ If the Government relies upon consent to justify the lawfulness of a search, see *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Mil.R.Evid. 314(e), it has the burden of proving that consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. White*, 27 MJ 264 (CMA 1988). Whether such consent was voluntary must be determined from the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Middleton*, 10 MJ 123, 132 (CMA 1981), and "must be shown by clear and convincing evidence," Mil.R.Evid. 314(e)(5). The person's knowledge of the right to refuse consent, *see Schneckloth v. Bustamonte, supra; United States v. Stoecker*, 17 MJ 158, 162 (CMA 1984), and the fact that the person is in some form of custody at the time consent is requested, *see United States v. Wallace*, 11 MJ 445, 448 (CMA 1981), are important factors to be considered. Neither, however, is fully determinative, one way or the other. Mil.R.Evid. 314(e)(4) and (5). To reiterate, the question of consent must be answered from the totality of the circumstances.

■ Viewing the evidence in the light most favorable to the Government, *see*

*United States v. Lowry*, 2 MJ 55, 59 (CMA 1976), we conclude from the totality of the circumstances that appellant's consent was voluntarily given. *See* factors discussed in *United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976), and *United States v. Middleton, supra* at 133.

First, appellant acknowledged to Harrison an awareness of his rights under Article 31. Certainly, Harrison's general inquiry in this regard would not be sufficient to meet the requirements for admissibility of a subsequent statement.[2] In the context of a consent to search, however, it does suggest that appellant was alerted to the fact that this confrontation with his commander was one in which his rights as a criminal suspect would be respected.

Second, by appellant's own admission, Harrison never overtly ordered appellant's compliance with his request for consent. We recognize that Goudy had been brought to Harrison's office under escort and that, under many circumstances, a request from a major in the Marine Corps likely would be met with a response of "aye, aye, sir."

However, granting appellant's plea to this Court to view these circumstances as an "implied order," even in the context just discussed in the first consideration above, would virtually establish a "bright-line" rule against a military commander's personally asking a subordinate for his consent to search unless the commander did so informally and without any of the usual trappings of military courtesy that accompany such a meeting. That is neither the law nor logic, much less both.

Third, beyond this, appellant was orally admonished by Laird that he did not have to give his consent, and the form which he signed reiterated that advice. Appellant claims that he did not read the form before signing it; if true, however, he omitted to do so at his own peril. In any event, he received the advice orally from Laird.

Fourth, Harrison told Goudy that he *needed* his consent in order to search. Accordingly, other than appellant's "implied order" argument addressed above, there is no basis for a claim that appellant's consent was merely acquiescence to a claim of lawful authority. *See generally Bumper v. North Carolina, supra* 391 U.S. at 548–50, 88 S.Ct. at 1791–92 (where searching official first asserted he possessed a warrant, the consent which followed was merely acquiescence to lawful authority, rather than true consent). The message was clear: Appellant, by virtue of his consent, held the key to his privacy.

Fifth, Goudy was a 20–year–old high-school graduate, with a GT/GCT score of 129[3] and 2 years of experience in the Marine Corps. Moreover, his testimony at trial—at least so far as can be discerned from the printed pages—was well articulated and assertive, not at all reflective of an uncertain or submissive person. All this makes it even less likely that appellant—alerted to his statutory rights as a criminal suspect and forthrightly advised that he did not have to consent—would have merely rolled over in the face of an "implied order," as opposed to deciding for himself that his best chance lay in voluntarily consenting.

Sixth, nothing in Harrison's message or demeanor could have overcome appellant's own free choice. The commander was calm and his voice was conversational, not overbearing in any manner. Further, Harrison made no obvious or subtle threats or promises to induce appellant to do something that he had not decided for himself was in his own best interest.

2. Unlike a situation in which a statement is sought from a suspect, there is no absolute requirement that a rights warning under Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b), be given before seeking or obtaining a valid consent to search. *United States v. Stoecker,* 17 MJ 158, 161–62 (CMA 1984); *United States v. Coakley,* 18 USCMA 511, 40 CMR 223 (1969).

3. To put appellant's score in perspective, we are informed by government counsel that the minimum GT score to enlist in the Marine Corps is 80. Further, counsel has advised this Court that an "EL" score of 115 qualifies the subject for certain officer programs; appellant's EL score is 131.

Instead, we agree with the Government's analysis in its final brief in this Court:

Using the totality of the circumstances test, it is apparent that appellant's consent was more likely based upon his guilty conscience and/or resignation to the inevitable. Acquiescence to one's circumstances is certainly distinguishable from acquiescence to authority. The facts show that appellant had previously (recently) been confronted by the owner of the trousers which appellant had stolen. Appellant had returned them after admitting to the owner that he had stolen them. He had also been recently confronted by the person who had purchased the television from appellant. It seemed as though the true owner of the television had taken issue with the fact that appellant had sold the television. Appellant had made admissions to the purchaser which were incriminatory. Appellant must have realized that things did not look very good for him at the time he was called into the commanding officer's office and advised that he was a suspect of those very crimes, as well as other thefts.

\*     \*     \*     \*     \*     \*

Whether he believed that he was caught and might as well give up or whether he hoped to bluff his way out of the situation by agreeing to the search to demonstrate that he had nothing to hide—either way, it does not amount to coercion or any overwhelming of appellant's free choice.

(Record citations omitted.)

### III

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.