## UNITED STATES

v.

**Sergeant Diane G. McLENDON, FR260–37–0438 United States Air Force.**

**ACM29884.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 14 January 1992.

Decided 14 March 1994.

Appellate Counsel for Appellant: Colonel Terry J. Woodhouse, Major Alice M. Kottmyer, Major Mary C. Yastishock, and Captain Ursula P. Moul.

Appellate Counsel for the United States: Colonel Richard L. Purdon, Colonel Jeffery T. Infelise, and Major Paul H. Blackwell, Jr.

En banc.

## OPINION OF THE COURT

DIXON, Chief Judge:

Sergeant McLendon pled guilty before a general court-martial, with officer members, to two offenses of wrongfully using cocaine, both based on positive urinalysis test results. The members sentenced her to a bad-conduct discharge, 12 months confinement, forfeiture of all pay and allowances, and reduction to airman basic, which the convening authority approved as adjudged. On appeal, she contends the military judge erred in not suppressing the urinalysis results supporting the second specification to which she entered a conditional guilty plea (specification of the Additional Charge). We disagree and affirm.

### FACTS

Sergeant McLendon, a 29-year-old C-5 loadmaster with over 5 years service, snorted cocaine at a party on August 4, 1991. The next morning, she provided a urine specimen for a base-wide random urinalysis. Shortly thereafter, she departed on terminal leave incident to separating from active duty. Her specimen tested positive for the cocaine metabolite. As a result, her commander recalled her to the base and preferred one specification under Article 112a, UCMJ, on September 12, 1991, alleging cocaine use between July 29 and August 4, 1991.

On October 18, 1991, Sergeant McLendon's first sergeant called her to his office to administer a reprimand after she missed an appointment while awaiting trial. At the office, he found Sergeant McLendon spinning around in a chair. He thought she appeared a "little on the dizzy side, kind of glassy-eyed" and "acting on the goofy side." He took his suspicions of drug use to the Dover Air Force Base "JAG office." One of the base lawyers advised him to ask her for a consensual urine specimen, and if she refused, to have her commander order a command-directed test. The first sergeant agreed and briefed the commander who also concurred in the planned course.

Dover Air Force Base used one form to cover all the various ways a member could provide a urine specimen, including by consent and by command-direction. The first

sergeant completed one form in advance for Sergeant McLendon's consent and another ordering a command-directed test if she refused. Dover Form 1 provided the following guidance on consent:

> I voluntarily give my consent to provide a urine specimen to be tested for illegal drugs, including cocaine and marijuana. I understand that I do not have to consent. I understand that the urinalysis test results, if positive for illegal drugs, may be used against me in criminal and administrative proceedings. I have not been forced by anyone to give consent.

Armed with the paperwork, the first sergeant went calling on Sergeant McLendon at her dormitory shortly after noon on the 18th. She answered his knock on the door dressed in civilian clothing. He immediately asked whether she would consent to providing a urinalysis and she indicated her willingness by responding "Sure." The first sergeant then gave her the prepared consent form to read and sign. He did not advise her that he suspected her of an offense nor did he inform her of her rights under Article 31, UCMJ. He watched as her fingers moved down the applicable section on the form that would provide for consent urinalysis. When her fingers reached the end of the consent portion, he indicated the remainder of the form did not apply. As she turned to get a pen to sign the form, she asked when she would provide the sample. The first sergeant indicated he had already sent an observer over to the hospital so they should proceed immediately. Appellant responded, "Great, I just went." and signed the form indicating her consent to the urinalysis.

As the first sergeant and Sergeant McLendon were leaving her room to go to the hospital laboratory, she asked what would have happened if she had not consented to the urinalysis. He informed her that she would have been directed to do so had she not consented. Her response to that was "Oh." They then proceeded to the hospital in separate vehicles. At the laboratory, she told an individual assisting in the urinalysis that she had been wanting to "give a random or a voluntary urinalysis ever since she came back to the base." Approximately one and

one-half hours were spent in the hospital before the urine sample was completed. At no time did she suggest she wanted to consult with her counsel, express a desire to use the telephone, or indicate, by her behavior or any words, that she was wavering or hesitant about providing the urine sample. Both the first sergeant and the assistant found Sergeant McLendon to be calm and cooperative throughout the procedure.

## APPELLANT'S TESTIMONY

Sergeant McLendon elected to testify on the search issue. She testified she did not read the Dover urinalysis form before she signed it, did not know she could refuse to consent, and felt she would be ordered to provide a specimen if she did not consent.

She explained that something was "voluntary" when she initiated it and not when a superior "requested" it. She also said she did not know the difference between a consent test and a command-directed test, and her attorney, the trial defense counsel, had not explained the difference before 18 October. On cross-examination, Sergeant McLendon conceded she thought any traces of cocaine would be out of her system on the 18th after last using it on the 15th.

## MILITARY JUDGE'S RULING

The military judge rejected portions of Sergeant McLendon's testimony that contradicted the sequence of events set out in the Facts section above. The military judge found Sergeant McLendon freely and voluntarily consented and never attempted to withdraw that consent. As for the "What would happen" question, the military judge concluded the first sergeant did not have to explain the difference in the two tests because all of the behavior of the accused indicated this was a question in passing. In his extensive findings, the military judge stated "it's abundantly clear that her question was not an indication of a wavering on her part of a desire to cooperate or give consent". In support of his ruling he stated:

> I further find and conclude that at no time did the accused withdraw or even imply a withdrawal of her consent for the urinalysis, but, indeed, to the contrary, all of her

actions point in the opposite direction, that her voluntariness and consent remained intact throughout the entire process.

## CONCLUSION

We conclude the military judge's ruling admitting the results of the second urinalysis to be correct. Reviewing the decision *de novo*, we find the evidence establishing appellant's consent is clear and convincing. Mil.R.Evid. 314(e)(5). *United States v. Goudy*, 32 M.J. 88 (C.M.A.1991); *United States v. Murphy*, 36 M.J. 732 (A.F.C.M.R.1992). This is not a case of mere submission to the color of authority or acquiescence in an announced or indicated purpose to search. Mil. R.Evid. 314(e)(4), *Cf. United States v. White*, 27 M.J. 264 (C.M.A.1988). There is nothing which suggests any hesitancy on the part of appellant to submit to the urinalysis and nothing which shows any desire on her part to reconsider her initial decision to consent. *United States v. Stoecker*, 17 M.J. 158 (C.M.A.1984). Under cross-examination, she admitted she never considered contacting her defense counsel before submitting to the test. Her statement she believed the test would be negative provides additional insight into what she was thinking. The fact that she was mistaken in her belief that the results would be negative does not alter the totality of circumstances showing a voluntary consent. The evidence leads us to the conclusion that appellant not only consented but wanted to provide the urine sample.

On the basis of the entire record, the approved findings of guilty and the sentences are hereby

## AFFIRMED.

Senior Judges SNYDER, RAICHLE, and HEIMBURG and Judges YOUNG and SCHREIER concur.

PEARSON, Judge, joined by GRUNICK, Judge (dissenting):

The majority's conclusion that appellant voluntarily consented to provide a urine specimen is wrong as a matter of law, their *de novo* review notwithstanding. We conclude the military judge abused his discretion by (1) erroneously shifting the burden of proof on the consent issue to appellant and (2) erroneously concluding appellant was not entitled to an explanation of the difference between command-directed and consent testing. *See United States v. Middleton*, 10 M.J. 123 (C.M.A.1981).

## SHIFTING OF BURDEN

When the government relies on consent as a basis for obtaining a urinalysis specimen from a military member, the government has the burden of proving by clear and convincing evidence, based on the totality of the circumstances, that the member freely and voluntarily consented. Mil.R.Evid. 314(e); *United States v. Goudy*, 32 M.J. 88 (C.M.A. 1991); *United States v. Murphy*, 36 M.J. 732 (A.F.C.M.R.1992). The military judge clearly showed he shifted that burden to appellant by the following language, "Therefore, I find *no evidence* to indicate *clearly or convincingly* that this *was not* entirely *voluntary* on her part...." (emphasis added).

Some may argue we are splitting hairs much too fine in our dissection of the judge's ruling. However, words are a lawyer's lifeblood. We do not believe it too heavy a burden to ask that judges be precise in their rulings, particularly when one's constitutional rights or liberty are at stake.

## EXPLANATION OF TESTING DIFFERENCES

The military judge also erred as a matter of law in holding that appellant was not entitled to an explanation of the difference between a consent urinalysis and a command-directed one.

The military judge found appellant asked the first sergeant the following question before departing her dormitory room, "What if I don't volunteer to do this, didn't volunteer?" The judge found the first sergeant replied, "You would have been directed." The military judge also accepted appellant's testimony that she did not read the urinalysis form, Dover Form 1, before she signed it. Neither the first sergeant nor the form informed appellant of her right to withdraw consent or the difference between a consent test and a "directed" one.

The results of a consent urinalysis are admissible against an accused in a court-martial or other disciplinary proceeding while those from a command-directed test are not (absent a few exceptions not relevant here). Air Force Regulation 30–2, Social Actions Program, ¶¶ 5–7, 5–8 (18 April 1986, Change 1, 19 August 1988). While appellant failed to read the consent section of the form at her peril, *Goudy, at* 91, once the first sergeant brought up the issue of a command-directed test, he had the obligation to explain the difference between the two tests to her. *See Goudy; United States v. McClain,* 31 M.J. 130 (C.M.A.1990); *United States v. White,* 27 M.J. 264 (C.M.A.1988); *United States v. Peoples,* 28 M.J. 686 (A.F.C.M.R. 1989).

"Failure to advise an accused of the critical difference between a consent and a command-directed urinalysis, once the subject is raised, converts what purports to be consent to mere acquiescence." *United States v. Cook,* 27 M.J. 858, 859 (A.F.C.M.R.1989). While appellant had already given an oral and written expression of consent, she could withdraw that consent up until the time she actually provided the specimen. However, the first sergeant's guidance to her was that withdrawal of consent was not a viable option. *United States v. Pellman,* 24 M.J. 672, 675 (A.F.C.M.R.1987).

Generally, one who withdraws consent must give clear notice of the withdrawal, *see United States v. Stoecker,* 17 M.J. 158 (C.M.A.1984); however, the first sergeant nipped appellant's withdrawal option in the bud. Appellant had little choice but to remain cooperative and helpful when told "You would have been directed," after asking, "What if I don't volunteer to do this, didn't volunteer?" A right to withdrawal that may be. inhibited in such a manner is no right at all, particularly when an individual is not informed of the right to withdraw consent in the first place.

Appellant's subjective state of mind also plays some part in our consent equation. *See Murphy; United States v. Fox,* 2 M.J. 377, 381 n. 3 (A.F.C.M.R.1977), *aff'd,* 4 M.J. 89 (C.M.A.1977). A weak personality, or "mindset" as the military judge called it,

does not automatically render one's consent to a search or seizure involuntary. *Cf. United States v. Gill,* 37 M.J. 501 (A.F.C.M.R. 1993) (weak personality and voluntary confession). For example, a military member's belief that a superior's request is always the equivalent of an implied order does not make the member's consent a mere submission to authority or acquiescence based on that belief alone. *Goudy.*

However, we should consider appellant's state of mind in determining the impact of the first sergeant's comments to her about a command-directed test and why appellant would appear so cooperative. Basically, the military judge found she was a pliant person when confronted with authority. We agree with his observation, particularly when trial counsel failed to offer any evidence concerning appellant's education, training, intelligence, and military background, all important factors in any consent analysis. In this regard, the military judge found appellant was a credible witness regarding her "mindset" about the consent issue.

The military judge found appellant had a "mindset" that "she should cooperate with virtually anything that an authority figure from the Air Force requested her to do with the impression, although incorrect, that any request was akin to an order in many respects and that if it was not complied with, that it would be followed by an order." More importantly for our analysis, the military judge found "[t]he response to her question as to what would have happened had she not voluntarily consented amount[ed] to simply reinforcing what she was already believing."

Finally, we note the government would have been in a worse position if appellant had read and understood each and every word of Dover Form 1. The command-directed section of the form stated "any information gained from the analysis of this urine specimen may be used for appropriate punitive action." Such advice conveys a message not totally in accord with the regulatory guidance and case law. The advice would materially mislead a suspect that an order to produce a specimen would produce useable evidence

whether the individual provided it voluntarily or not. *Pellman.*

## CONCLUSION

We determine appellant's consent was involuntary as a matter of law and would hold the October 18th urinalysis results were inadmissible since the government did not offer any other theory for admissibility. We would set aside the findings of guilty of the Additional Charge and its specification, and order a rehearing. We do not believe we may accurately reassess the sentence in this case as the court which sentenced appellant had to consider her a two time loser who had the audacity to continue to use cocaine while pending court-martial—we can't envision a more aggravated drug use case to face a military court. *See United States v. Peoples,* 29 M.J. 426 (C.M.A.1990).