*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, HITESMAN, and GASTON
Appellate Military Judges

———————————

**UNITED STATES**
Appellee

**v.**

**Charles L. DAVIS**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201800258**

Decided: 3 March 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Lieutenant Colonel F. W. Hoover, USMC. Sentence adjudged 23 May 2018 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of a military judge sitting alone. Sentence approved by the convening authority: reduction to pay grade E-1, confinement for eight years, and a dishonorable discharge.

For Appellant: Lieutenant Salomee Gethoeffer Briggs, USCG; Captain Thomas R. Fricton, USMC.

For Appellee: Lieutenant George R. Lewis, JAGC, USN; Captain Brian L. Farrell, USMC.

Judge GASTON delivered the opinion of the Court, in which Chief Judge CRISFIELD and Senior Judge HITESMAN joined.

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

—————————————

GASTON, Judge:

Appellant was convicted, contrary to his pleas, of three specifications of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b (2012), for touching the genitalia of his five-year-old stepdaughter DB on two occasions and directing his four-year-old stepdaughter PB to watch.[1] He asserts five assignments of error (AOEs), which we reorder as follows: (1) the military judge erred by denying as untimely a mid-trial motion to suppress evidence obtained from Appellant's cell phone; (2) Appellant's trial defense counsel were constitutionally ineffective for not adequately investigating the cell phone suppression issue prior to entry of pleas and filing a timely motion to suppress evidence obtained from the phone; (3) the military judge abused his discretion in admitting various out-of-court statements under the residual hearsay exception, MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 807, MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.); (4) the evidence is legally and factually insufficient to support Appellant's convictions; and (5) the adjudged sentence of reduction to pay grade E-1, confinement for eight years, and a dishonorable discharge is inappropriately severe.[2]

We find no prejudicial error and affirm.

## I. BACKGROUND

Evidence of the offenses of which Appellant was convicted surfaced during family holiday gatherings in November-December 2016 at the home of Diane Arness,[3] the grandmother of Appellant's wife, Mrs. Davis. On Thanksgiving

---

[1] Appellant was acquitted of additional specifications charging him with unlawfully exposing his genitalia to DB and PB, touching PB's genitalia, and digitally penetrating DB's vulva.

[2] The third, fourth, and fifth AOEs are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] Pseudonyms have replaced many surnames referenced in the opinion.

Day, five-year-old DB grabbed the genitals of her grandfather, Paul Vinson, over his clothes. When he told her that was not appropriate, DB responded, "You didn't like that?"[4] During the Thanksgiving and Christmas holidays, Ms. Arness observed DB with her hand in her pants. When Ms. Arness asked her on Thanksgiving what she was doing, DB responded, "[my] stepdad said that it made you feel good."[5] When Ms. Arness asked whom DB meant by her "stepdad," DB said, "Mike" (her biological father), as opposed to "Charlie" (her stepfather, Appellant). But once Mrs. Davis (the biological mother of DB and PB) learned of the incident, she suspected Appellant was sexually abusing DB because DB's biological father had not been involved in DB's life for a year or more, and DB had begun having behavioral issues in school in October 2016.

Mrs. Davis notified the base Family Advocacy Program about the suspected abuse on 18 January 2017. The local Department of Social Services (DSS) was then notified, and a social worker from DSS made an unannounced visit to the family home that same day. When interviewed, Appellant told the social worker that in conjunction with bathing her, he had touched DB in her vaginal area in order to teach her "good touch" from "bad touch" and right from wrong, but denied doing so in a sexual way. DSS then notified the Naval Criminal Investigative Service (NCIS).

DB and PB were forensically interviewed the following day, 19 January 2017, at the local Child Advocacy Center. DB told the interviewer that Appellant "tried to sneak in [her] panties and touch [her]"[6] and tried to unbutton her pants and pull them down. Using a diagram, she said Appellant touched her vaginal area and told her to close her eyes when he did so.

NCIS interrogated Appellant the next day, 20 January 2017. He initially denied touching the vaginal area of DB or PB for any reason. Subsequently, after being told about the forensic interviews, Appellant admitted touching DB's vaginal area on two occasions. He denied doing so for any sexual reason or pleasure, but admitted that what he did was not okay. He said that on one occasion between August and October 2016 he inserted his fingers underneath DB's underwear to pull them out and check them to see if she had

---

[4] Record at 236.

[5] *Id.* at 248.

[6] Pros. Ex. 5.

urinated, and that his fingers may have penetrated her labia because his knuckles became moist and wet. He said that on another occasion between Thanksgiving and Christmas 2016 he touched DB's vagina while she was bathing to teach her what a good sexual touch is. He said he did this to DB in the presence of PB and told PB to pay attention. He said he also used dolls to show both DB and PB what a "good touch" is, and told DB that "guys" also have areas for "good touches" in their private areas.[7] He said that after he touched DB, he told her not to tell anyone about it, or else he and her mother could go to jail.[8]

In follow-up forensic interviews on 16 May 2017, both DB and PB said Appellant would bathe them on occasion. DB said there were rules about not touching private areas and that Appellant did not break those rules anymore.

Additional facts necessary to resolve the AOEs are discussed below.

## II. DISCUSSION

### A. Denial of Motion to Suppress

In conjunction with Appellant's interrogation on 20 January 2017, NCIS asked if they could search his cellular phone. Appellant consented to the search of his new phone. He said that his old Verizon HTC phone was "completely smashed" and was in his wife's possession, but that it was fine for NCIS to search it, too, if they were able to get it and access its contents. NCIS later followed up with Mrs. Davis in February 2017 and obtained Appellant's damaged HTC phone from her, along with her permission to search it. Prior to searching the phone, NCIS also requested and received Appellant's written consent in the form of a signed Permissive Authorization for Search and Seizure (PASS) that permitted a search of the Verizon HTC phone "and all applications and data files contained within."[9]

A subsequent forensic search of the phone's memory chip yielded evidence that in early January 2017 the phone was used to conduct an Internet search on the topic of "what age can girls start getting wet?" The phone was then used to visit websites addressing the topics of "When do girls start to get

---

[7] Pros. Ex. 1; Pros. Ex. 2.

[8] Pros. Ex. 1.

[9] Article 32 Preliminary Hearing Officer's Report, Ex. 16.

4

wet?"; "At what age do girls start to produce vaginal lubrication and is it 'dry' before that time?"; and "At what age do most girls have their first orgasm?"[10] NCIS documented these investigative actions related to the phone in written reports, which the Government turned over to the Defense in pretrial discovery.

Appellant entered pleas of not guilty on 21 May 2018, the first day of a three-day bench trial. On day two of the trial, in response to questions from the military judge, Mrs. Davis testified that during a telephonic argument with Appellant around 15 January 2017, he told her not to come back to their home. She testified that sometime later, she returned to get personal items from their home and found and picked up Appellant's damaged HTC phone along with various other electronic devices and took them with her. She said she later turned over the damaged HTC phone to NCIS.

After hearing this testimony, Appellant's trial defense counsel moved to suppress the contents of the phone as stemming from an illegal seizure, arguing that Mrs. Davis had acted as a government agent when she took Appellant's phone from the marital home and later turned it over to NCIS. As good cause for the late motion, the Defense cited Mrs. Davis' unwillingness to be interviewed by the Defense prior to trial and a lack of clarity in the discovery materials about (a) which of Appellant's Verizon HTC phones (old versus new) the Internet search evidence had been found on and (b) the circumstances under which Mrs. Davis turned over the old phone to NCIS. In response to questions from the military judge, the defense counsel admitted he did not attempt to clarify these issues prior to trial by either examining the actual phone itself, which was in the NCIS evidence locker, or speaking with the NCIS agent who had received the phone from Mrs. Davis. Upon examining the NCIS reports regarding the phone that were turned over in discovery to the Defense, the military judge found a lack of good cause for the late suppression motion and denied it as untimely.

Appellant asserts the military judge erred in denying the motion as untimely. We review such rulings by the trial court for an abuse of discretion. *United States v. Jameson*, 65 M.J. 160, 163 (C.A.A.F. 2007). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F.

---

[10] Pros. Ex. 11.

2010) (citation and internal quotation marks omitted). A ruling based on an erroneous view of the law constitutes an abuse of discretion. *United States v. Griggs*, 61 M.J. 402, 406 (C.A.A.F. 2005) (citing *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003)).

Generally, motions to suppress evidence must be made before pleas are entered. RULE FOR COURTS-MARTIAL (R.C.M.) 905(b)(3), MCM. Failure to bring the motion before pleas are entered constitutes waiver absent a showing of good cause. R.C.M. 905(e). Whether good cause exists largely depends on when the Defense acquired the necessary information to know about the evidence at issue and the basis for suppressing it. Not learning about the basis for a motion to suppress until after pleas are entered can constitute good cause, which "should be liberally construed in favor of permitting an accused the right to be heard *fully* in his defense." *United States v. Coffin*, 25 M.J. 32, 34 (C.M.A. 1987) (emphasis in original). On the other hand, it is not good cause "when the defense knew or could have known about the evidence in question" prior to the relevant deadline. *Jameson*, 65 M.J. at 163.

Here, based on our review of the discovery and other evidence available to the Defense prior to trial, we agree with the military judge that the Defense had access to the pertinent materials regarding the damaged HTC phone well before Appellant's entry of pleas on 21 May 2018. These materials revealed: that Appellant told NCIS during his interrogation on 20 January 2017 that his old HTC phone was seriously damaged, that it was in Mrs. Davis' possession, and that he was fine with NCIS searching it if they could get it and access its contents; that NCIS subsequently asked for and received the damaged phone from Mrs. Davis in February 2017; that NCIS then requested and received Appellant's consent (documented in a written, signed PASS) prior to forensically searching the phone's contents; and that the ensuing search yielded evidence germane to the charges. Thus, notwithstanding Mrs. Davis' unwillingness to submit to a pretrial interview and the Defense's claim of surprise about her testimony at trial, the Defense had long had access to sufficient information to investigate and file a timely suppression motion, which could have been litigated during one of the multiple pretrial motions sessions the military judge held to handle such issues. Under these circumstances, we find no abuse of discretion for the military judge to rule that the Defense failed to show good cause for the mid-trial suppression motion and consequently to deny the motion as untimely.

## B. Ineffective Assistance of Counsel

Appellant claims his trial defense counsel were constitutionally ineffective for failing to adequately investigate and timely move the court to suppress the cell phone evidence discussed above. We review claims of ineffective

assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted). Our review uses the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687). When a claim for ineffective assistance of counsel is premised on trial defense counsel's failure to move the court to take some action, "an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citation and internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Failure to raise a meritless argument does not constitute ineffective assistance." *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997) (quoting *Boag v. Raines*, 769 F.2d. 1341, 1344 (9th Cir. 1985)).

Here, we find Appellant has failed to show a reasonable probability that a timely-filed motion to suppress the cell phone evidence would have been meritorious. On a motion to suppress, the Government bears the burden of proving by a preponderance of the evidence that the evidence at issue was not obtained as a result of an unlawful search or seizure. MIL. R. EVID. 311(d)(5)(A). Evidence obtained as a result of an unlawful search or seizure is subject to potential exclusion if executed "by a person acting in a governmental capacity." MIL. R. EVID. 311(a). This same Fourth Amendment protection does not apply, however, to "a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of a governmental official." *United States v. Buford*, 74 M.J. 98, 100 (C.A.A.F. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984)). To determine whether an individual is acting in her private capacity or as an agent of the Government, we examine "all the facts and circumstances" in the case. *United States v. Jones*, 73 M.J. 357, 361-62 (C.A.A.F. 2014). While the identity and motivation of the individual conducting the search or seizure is a factor to be considered, the determination "does not hinge on motivation, but rather 'on the degree of the Government's participation in the private party's activities.'" *United States v. Daniels*, 60 M.J. 69, 71 (C.A.A.F. 2004) (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-15 (1989)). "To implicate the Fourth Amendment in this respect there must be 'clear indices of the Government's encouragement, endorsement, and participation' in the challenged search." *Id.* (quoting *Skinner*, 489 U.S. at 615-16).

In this case, there is no evidence that the Government encouraged, endorsed, or participated in Mrs. Davis' seizure of the phone from the marital home. Based on the record before us, we can ascertain only that the seizure occurred sometime between Appellant's telephonic argument with Mrs. Davis around 15 January 2017 (when he told her not to come back to the home, where the phone was located) and Appellant's interrogation by NCIS on 20 January 2017 (at which point he told the agents the phone was in Mrs. Davis' possession). Circumstantial evidence suggests the possibility that Mrs. Davis did not retrieve the phone until after speaking with NCIS at the Child Advocacy Center in conjunction with her children's forensic interviews on 19 January 2017; however, the timeline was never clarified on the record. Thus, we simply cannot determine as a factual matter whether the seizure even occurred after notification was made to law enforcement on 18 January 2017, let alone whether NCIS had anything to do with Mrs. Davis' retrieval of the phone.

Even assuming *arguendo* we could determine that Mrs. Davis was acting as a Government agent when she obtained the phone, the evidence supports that the search of the phone was valid based on Appellant's consent. Evidence of a search "is admissible if conducted with lawful consent." MIL. R. EVID. 314(e)(1). On a motion to suppress, the Government bears the burden of proving consent by clear and convincing evidence. MIL. R. EVID. 314(e)(5). To be valid, a person's consent to search must be voluntary, which is "determined from all the circumstances." MIL. R. EVID. 314(e)(4). Factors to be considered in this regard include the person's age, education, experience, length of military service, rank, knowledge of the right to refuse to give consent, and whether the environment in which the permission to search was obtained was custodial or coercive. *See United States v. Goudy*, 32 M.J. 88, 90-91 (C.M.A. 1991) (holding that whether the Government has met its burden is evaluated from the totality of the circumstances).

In this case, Appellant repeatedly consented for NCIS to search the phone. During his interrogation, he gave explicit permission for NCIS to obtain the phone from Mrs. Davis and to search it if they were able to connect it to an extraction machine and get information from it. While the scope of consent "may be limited in any way by the person granting consent," MIL. R. EVID. 314(e)(3), there is no indication Appellant ever limited or withdrew his initial permission for NCIS to search his phone once they got it from Mrs. Davis.

Even so, once NCIS obtained the phone from Mrs. Davis, they nevertheless brought Appellant into his executive officer's office on 28 March 2017, again requested and received his consent to search the phone, and obtained a written PASS from him to that effect. The PASS that Appellant initialed and signed informed him that he was suspected of sexual assault of a child and

that he had a "constitutional right to refuse to permit this search in the absence of a search warrant."[11] It granted broad authorization to search both the phone "and all applications and data files contained within."[12] While we agree that the environment in which the PASS was obtained from Appellant—the office of his O-4 executive officer—could be coercive to someone of Appellant's age, experience, and military rank, we have little or no evidence in the record before us to demonstrate, as Appellant now claims, that his consent was not voluntary. And the following day, when telephoned by NCIS to request the phone's passcode, Appellant voluntarily provided several possible passcodes for unlocking it.

All of this preceded the NCIS search of the phone's memory chip that yielded the evidence at issue. Thus, even taking into consideration the potentially coercive environment in which the PASS was obtained, in light of all the other facts and circumstances discussed above, we find clear and convincing evidence that Appellant's consent was voluntary. We therefore conclude that Appellant has not shown a reasonable probability that a timely filed suppression motion would have been meritorious in this case, and consequently find his claim of ineffective assistance of counsel to be without merit.

## C. Residual Hearsay

Appellant asserts the military judge erred by admitting out-of-court statements made by DB and PB to various third parties under the residual hearsay exception, MIL. R. EVID. 807. We review such rulings to admit or exclude evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013); *United States v. Czachorowski*, 66 M.J. 432, 434 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted).

The residual hearsay exception provides for the admission of otherwise excludable hearsay statements, even if not specifically covered by another

---

[11] Article 32 Preliminary Hearing Officer's Report, Ex. 16.

[12] *Id.*

hearsay exception, provided reasonable notice is given and the following conditions are met:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

MIL. R. EVID. 807. Our superior court has summarized these conditions precedent to admission as "(1) materiality, (2) necessity, and (3) reliability." *United States v. Kelly*, 45 M.J. 275, 280 (C.A.A.F. 1996). Reliability is determined through the weighing of such factors as the mental age and state of the declarant; the spontaneity of the statement; whether suggestive questioning was used; and whether the statement can be corroborated. *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003); *United States v. McGrath*, 39 M.J. 158, 166-67 (C.M.A. 1994). The necessity prong requires the proponent to show that reasonable efforts cannot produce more probative evidence, which is applied somewhat more liberally to statements of child victims. *Kelley*, 45 M.J. at 280-81. And the evidence must still satisfy the Confrontation Clause as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004), which generally requires that the declarant testify and be subject to cross-examination. *Id.* at 54.

This issue was thoroughly litigated prior to trial on the Government's motion for a preliminary ruling on the admissibility of the various statements, which the Defense opposed. After a hearing, the military judge ruled some of the statements admissible as residual hearsay provided the necessity prong could be met, for which he reserved his ruling until trial. At trial, the testimony of both victims revealed that they could not remember Appellant's alleged acts. The Defense at that point conceded that the victims' testimony satisfied the requirements of the Confrontation Clause and the residual hearsay rule's required showing of necessity. The Government then submitted the forensic interviews of both victims and various other statements that the military judge had previously ruled admissible and admitted, as explored more fully below. During the presentation of this evidence, the Defense did not note further objections on the record.

*1. Waiver*

As an initial matter, the Government argues Appellant waived this issue upon his trial defense counsel stating "no objection" when the evidence was offered at trial. We disagree.

Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Gladue,* 67 M.J. 311, 313 (C.A.A.F. 2009) (citations omitted). Waiver is different from forfeiture, which is "the failure to make the timely assertion of a right." *Id.* Generally, a mere failure to object at trial amounts to forfeiture and is reviewed for plain error, which occurs when there is an error, it is obvious, and it results in material prejudice to a substantial right. *United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998). If the issue was waived, however, there is no error for this Court to review on appeal. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

Here, we find neither waiver nor forfeiture. The issue of the admissibility of the victims' out-of-court statements as residual hearsay was thoroughly litigated pretrial and was opposed by the Defense. The military judge issued a pretrial ruling regarding the statements at issue, reserving only a final ruling on the necessity prong based on the testimony of the victims at trial. We find that the military judge's ruling preserved the MIL. R. EVID. 807 issue in all respects except as to the necessity prong, which the Defense conceded at trial after the victims testified. *See* MIL. R. EVID. 103(b) ("Once the military judge rules definitively on the record admitting or excluding evidence, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

*2. Statements of DB and PB to forensic interviewer*

The military judge concluded the videotaped forensic interviews of DB and PB on 19 January 2017 and 16 May 2017 were admissible in their entirety under the residual evidence rule. We agree.

The victims' statements to the interviewer were evidence of facts material to the charges against Appellant. Specifically, the statements demonstrated the victims' knowledge of facts and circumstances surrounding the charged incidents of sexual abuse, their relationship with Appellant, and their ability to identify parts of their bodies. Given that the victims could not remember Appellant's alleged acts by the time of trial, their statements to the interviewer were necessary (as the Defense conceded), as more probative evidence was not available.

Reliability of the evidence was hotly contested, and the question of suggestibility during the interviews was raised and explored by experts from both sides. While there was no precise protocol for the interviewer to follow in questioning children as young as four and five years old, we find little

evidence of suggestibility in the way the questions were asked during the videotaped interviews. Although the victims had made previous statements about the allegations to Mrs. Davis and other adult family members, we find little evidence suggestive of coaching or other improper influence to contaminate the interviews themselves, particularly with regard to the interviews conducted on 19 January 2017 in which the principal incriminating statements were made. The victims' statements were also corroborated in key respects by Appellant's own statements to NCIS, in which he admitted among other things touching DB's vaginal area on two occasions, doing so on one occasion in conjunction with bathing DB and PB, and telling PB to pay attention. Taken together, we find this evidence has sufficient circumstantial guarantees of trustworthiness to satisfy the reliability prong.

Finally, given the young age of the children and the nature of the material at issue, we find that admitting the videotaped interviews best served the purposes of the evidentiary rules and the interests of justice, by allowing the full and fair assessment of both the victims' accounts and the overall reliability of the interview process. Thus, we conclude it was not an abuse of discretion for the military judge to admit this evidence.

### 3. Statements to family members

The military judge also ruled the following out-of-court statements made by DB and PB to family members admissible under the residual hearsay rule:

1. DB's statements to Mr. Vinson (her grandfather) during Thanksgiving 2016, after she grabbed his penis over the clothes, that it was "supposed to feel good";

2. DB's statements to Ms. Barnes (her grandmother) during Thanksgiving 2016, asking several times while bathing "if she was going to play with her like Charlie" and then touching her genital area;

3. DB's and PB's statements to Ms. Arness (their great-grandmother):

   In October-November 2016, DB had her hand in her pants touching her vaginal area and said "Mike her real dad" (who had not been in her life for a year or more) said that "it made you feel good";

   Around Christmas 2016, PB told her "Charlie hurt [DB]" and "touched her in two places that you're not supposed to," pointing to her chest and genital area;

4. PB's statements to Mrs. Davis in January 2017, while screaming and crying in the bathtub, that she was scared Appellant was going to hurt her while pointing to her genitals, and that Appellant told her to learn from DB;

5. DB's and PB's statements to Ms. House (their step-grandmother):

In February 2017, DB was rubbing her vaginal area in the bathtub and when confronted about it said "Daddy Charlie did it to me there";

Around February 2017, PB said "Daddy Charlie hurt my sister and me in my 'no-no' spot," pointing to her chest and genital area;

PB woke up from a nightmare and said, "Daddy you're hurting me." "He touched us. He hurt [DB]."

We find no abuse of discretion in the admission of these statements as residual hearsay.

The statements are evidence of material facts, as they describe facts and circumstances surrounding charged incidents of child sexual abuse.

They are also reliable and possess circumstantial guarantees of trustworthiness. The statements were spontaneous and not made in response to suggestive questions from the victims' family members. Many occurred in contexts likely to trigger such statements due to their similarity to the context of the statements' substance, such as something occurring during bath time. As such, there is little to indicate they are the product of coaching or other improper influence. The statements are also corroborated by Appellant's own statements to NCIS about touching DB in her vaginal area and instructing PB to watch in connection with bathing them.

They are necessary (as the Defense conceded at trial), in light of the victims' testimony indicating lack of memory regarding Appellant's alleged acts, and are thus more probative on the points for which offered than any other available evidence obtainable through reasonable efforts.

Finally, given the young age of the victims and the subject matter of the statements, we agree with the military judge that admitting the statements best served the purposes of the evidentiary rules and the interests of justice.

**D. Legal and Factual Sufficiency**

Appellant asserts the evidence is legally and factually insufficient to support his convictions. We review such questions de novo. Art. 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). To determine legal sufficiency, we ask whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015). In evaluating factual sufficiency, we determine whether, after weighing the

evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

Appellant was convicted of touching the genitalia of DB on two separate occasions, and doing so in the presence of PB on one of those occasions. In order to prove the act of sexual abuse of DB between 1 and 31 October 2016, the Government was required to prove (1) that Appellant intentionally touched the genitalia of DB, a child under 12, with his hand; and (2) that he did so with the intent to gratify his sexual desire. MCM, ¶ 45b.b.(4)(a). In order to prove the act of sexual abuse of DB between 1 November 2016 and 1 January 2017, the Government was required to prove (1) that Appellant intentionally touched the genitalia of DB, a child under 12, with his finger; and (2) that he did so with the intent to abuse DB and gratify his sexual desire. *Id.* In order to prove the act of sexual abuse of a child involving indecent conduct between 1 November 2016 and 1 January 2017, the Government was required to prove (1) that Appellant engaged in indecent conduct, to wit: intentionally touching DB, a child under 12, on the genitalia with his hand with the intent to abuse DB and gratify his sexual desire, and intentionally did so in the presence of PB, a child under 12; and (2) that the indecent conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations. MCM, ¶ 45b.b.(4)(e).

Here, the military judge's findings essentially tracked Appellant's statements to NCIS, wherein he admitted touching DB's vaginal area on two occasions during the separately charged timeframes. He stated that on the first occasion, while checking DB's underwear for urination, he put his fingers under DB's underwear long enough that he may have penetrated her labia, because his knuckles became moist and wet. He stated that on the second occasion, he touched DB's vaginal area in the presence of PB (and told her to pay attention) for the purpose of teaching "good touch" from "bad touch." Specifically, he said he was trying to teach what a good sexual touch was. He said he also used dolls to show both DB and PB what a "good touch" is, and that he told DB that "guys" also have areas for "good touches" in their private areas. Appellant eventually made these admissions to NCIS after

repeatedly denying touching either victim's vaginal area for any reason. And he said that after he touched DB, he told her not to tell anyone about it or else he and their mother could go to jail. While the issue was hotly contested at trial, the Government's expert testified that Appellant's admitted actions toward DB and PB were examples of grooming behavior whereby an adult seeks to normalize inappropriate sexual contact with a child and then uses threats to keep the misconduct from being reported.

Appellant's admissions, which formed the basis of his convictions, were corroborated at trial by testimony from other third parties supporting that Appellant was alone with the victims in the contexts and timeframes he described. His admissions were also corroborated by the statements DB and PB made to family members and to the forensic interviewer that were admitted under the residual hearsay rule. They were further supported by the Internet searches conducted on Appellant's phone in early January 2017, which are indicative of a sexual interest in children. *See United States v. Rodriguez*, 79 M.J. 1 (C.A.A.F. 2019) (sexual intent in kissing child's feet proven by circumstantial evidence due to subsequent text messages discussing sexual fetish involving feet and referencing the child). We have considered Appellant's arguments that the proof is lacking regarding the requisite intent to abuse DB and to gratify his sexual desire and that the evidence does not support that his conduct involving PB amounts to a form of immorality relating to sexual impurity or that it tends to excite sexual desire or deprave morals with respect to sexual relations. We find these arguments to be without merit.

Considering the evidence in the light most favorable to the prosecution, we conclude a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. The evidence is thus legally sufficient to support the convictions. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt.

### E. Sentence Appropriateness

Finally, Appellant asserts that the adjudged sentence is inappropriately severe. We review the appropriateness of a sentence de novo. *United States v. Lane,* 64 M.J. 1, 2 (C.A.A.F. 2006). This Court "may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy,* 26 M.J. 394, 395 (C.M.A. 1988). The analysis requires "'individualized consideration' of the

particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy,* 27 C.M.R. 176, 180-181 (C.M.A. 1959)). However, we are not authorized to engage in exercises of clemency, as that "involves bestowing mercy" which is a "command prerogative." *Healy,* 26 M.J. at 395-396.

After reviewing the entire record, we find that the sentence is appropriate for this offender and his offenses. The maximum punishment for the Charge and specifications of which Appellant was convicted is reduction to E-1, total forfeitures, confinement for 55 years, and a dishonorable discharge. The adjudged sentence of reduction to E-1, confinement for eight years, and a dishonorable discharge is considerably less than this maximum. Appellant engaged in serious criminal misconduct against vulnerable young children in his care and then intentionally placed them in fear in an effort to prevent them from reporting his actions. Weighing the gravity and circumstances of this misconduct against his record of service and the other evidence in extenuation and mitigation, we are convinced that justice was done and Appellant received the punishment he deserves. *See Healy,* 26 M.J. at 395. Granting sentence relief at this point would be to engage in clemency, a prerogative reserved for the convening authority, and we decline to do so. *See id.* at 395-96.

## III. Conclusion

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ. The findings and sentence as approved by the convening authority are **AFFIRMED**.

Chief Judge CRISFIELD and Senior Judge HITESMAN concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

16